UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CR 02-85

UNITED STATES OF AMERICA,

PLAINTIFF,

v.

CAROL LOUISE GILLMORE,

DEFENDANT

---

**DEFENDANT'S BRIEF IN SUPPORT OF HER MOTION TO SUPPRESS**

---

We question whether Ms. Gillmore was in custody on the first day of her interrogation, which was accomplished sans Miranda warnings. As to her statement made the following day, we question whether the delay in her presentment to Magistrate Judge Burg was unnecessary within the meaning of statute and case law. Between the time Ms. Gillmore should have appeared and the time she did, the FBI secured her second confession.

**The facts**.

On February 13, 2002, within the Red Lake Indian Reservation, the body of

George Stately was discovered. He had been murdered, his home set aflame. (T. 23). F.B.I. investigation revealed that, while alive and over the telephone, Mr. Stately had greeted a "Carol" with the words, "what are you doing here." (T. 25). Carol was identified as Ms. Gillmore. Blood stains had been observed on Ms. Gillmore's care, her women's shelter, when Agent Egelhoff and Officer Jason Laurence arrived for their interview. (T. 25). The officials were armed. (T. 26).

And they were informed that Ms. Gillmore had received an injection of Ativan earlier that morning. (T. 27). And that she was on her way to Thief River Falls for further medical attention. (T. 16, 27). Agent Egelhof's intent was that Ms. Gillmore be interviewed before she sought further medical care. (T. 28). She was not assured as to a limited amount of time for discussion, nor that she would be allowed to seek out the medical care she desired. (T. 29). He mentioned to Ms. Gillmore that "no harm would befall her." (T. 31). She had cuts on her hands, bruises on her head, her nose and face. (T. 35). No formal waiver of rights was signed. (T. 28).

She was placed within a room, the door shut, with Egelhof and Laurence between the door and their object of attention. (T. 29). After the one hour interview, Agent Egelhof phoned the United States Attorney's office in Minneapolis. He was instructed to arrest Ms. Gillmore and did. (T. 30). He had

planned to anyway. "I believe it was without doubt that she would be charged at some point." (T. 31).

Ms. Gillmore was then placed in the Red Lake jail, where she received no medical attention. (T. 32). The following day she was taken to the Beltrami County Jail in Bemidji, near 3:00 PM. (T. 32). By then, Egelhof had secured a formal written complaint and warrant. (T.18, 32). There was scheduled a 4:00 PM appearance before Magistrate Judge Burg. (T. 32). The Magistrate, said Egelhoff, "made his own arrangements for times, and he would generally do it at a time after his normal work hours or close to the end of the day because he utilized one of the Beltrami County's courtrooms." (T. 21). He was not notified that Ms. Gillmore was available at 3:00 PM, and instead the FBI conducted another interview, beginning at 3:14 PM. (T. 33). Agent Egelhof understood that, once Ms. Gillmore secured counsel, his chance at further questioning would be diminished at best. (T. 34).

There was a twenty-four hour gap between the time of Ms. Gillmore's arrest and her presentment. (T. 21).

**The merits**.

**A. The first interrogation**.

Custody is a word that does not apply exclusively to a formal arrest, but

whether a defendant is deprived of his freedom of movement in any significant way. California v. Beheler, 463 U.S. 1121, 1125 (1983); United States v. McKinney, 88 F.3rd 551, 553 (8th Cir. 1996). The "totality of the circumstances" are to be considered, United States v. Helmel, 769 F.2d 1306, 1320 (1985), "how a reasonable (woman) in the suspect's position would have understood (her) situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). This Court must look, of course, to "the objective circumstances" of the interrogation. Stansbury v. California, 511 U.S. 318, 323 (1994).

The six factors set out in United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), have long determined the "indicia of custody." Id. at 1349. This is the same analysis employed in United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002), but recently discounted in United States v. LeBrun, 363 F.3d 715, 719 (8th Cir. 2004) (en banc), and United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004) (no requirement that the Griffin factors be followed "ritualistically"), cert. denied, 125 S.Ct. 2514 (2005). Nonetheless, the factors provide a construct which is helpful in briefing the issue, and we address them here.

The six factors to be considered:

1. Whether the suspect is told the questioning is voluntary and that she is free to leave and not under arrest;

2. Whether the suspect has unrestrained freedom of movement during the interrogation;

3. Whether the suspect initiated contact with the authorities or voluntarily acquiesced;

4. Whether strong arm tactics or "deceptive stratagems" were employed during the interrogation;

5. Whether the atmosphere of questioning was police dominated; and

6. Whether the suspect was placed under arrest when questioning was completed.

Griffin, 922 F.2d at 1349; United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003) (citing the Griffin factors and noting they are "non-exhaustive").

We take each in seriatim.

1. Advice given by Agents.

Agent Egelhof noted the interview was voluntary.

2. The freedom movement, to leave.

Similarly, Agent Egelhoff said he told Ms. Gillmore she was free to leave. But was she? Law enforcement officials sat between Ms. Gillmore (and her advocate) and the doorway. They were informed that she was about to attend to her medical needs. They stopped her, with the thought of an extended chat.

The measure of one's life is how close what one says matches what one does. Here Agent Egelhoff's conduct and verbiage dissociated. While the Agent may have intoned to Ms. Gillmore she was free to leave and so on and so forth, his nonverbal communication indicated he was there to stay. She was too. This Court is, of course, to make findings "particularly as to witness credibility." United States v. Oropesa, 316 F.3d 762, 766 (8th Cir. 2002).

3. Initial contact.

The F.B.I.'s conduct was designed in such a way as to control the initial contact, and hence that interview that would follow.

4. Strong arm tactics, the threat of arrest.

The tactic about which we complain concerns access to medical care. Ms. Gillmore has a history of mental illness. She received a shot of Ativan, an anti-anxiety drug, that morning. Given her tenuous condition, she was at the "complete mercy" of the agent, Mincey v. Arizona, 437 U.S. 385, 399 (1978), thus hardly free to go. He made her wait, talk, and ultimately confess while in immediate need of treatment.

5. Police domination.

Most law enforcement agencies use two police officers to dominate the interview. See Miranda v. Arizona, 286 U.S. 436, 452 (1966) (noting law

enforcement's historic proclivity toward tandem interviewers, the "friendly and unfriendly," the "mutt and Jeff"). Over thirty years ago, this unfair physical and psychological advantage persuaded the Supreme Court to mandate Fifth and Sixth Amendment warnings as a buffer. Id. at 449-458.

The most helpful trend in law of confessions after Miranda is practice of turning on a video and tape recorder. Where there used to be endless hearings about what was said to whom and how, nowadays a State Court Judge turns a switch on and makes a determination. The legal virtues of accountability and openness are thus served.

But the FBI still refuses to make a simultaneous recording, which is the great check on police overreaching when you think about it. Instead of having Agent Egelhof recount what he probably did three years ago, we would hear his voice, coupled with Ms. Gillmore's and we would all know for certain what was said. We would hear of Ms. Gillmore's trembling and tears, Egelhof's purported calm intensity and patience, and we would make our own determination.

That is not the way the FBI works, of course. Agents take advantage of a difference between state and federal law. Compare State v. Scales, 518 N.W.2d 587 (Minn. 1994) (requiring a tape record of defendant interviews) with United States v. Molina, 172 F.3d 1048, 1059 (8th Cir. 1999) (law enforcement agent takes

the investigation federal thereby avoiding a taping requirement).

Yet with or without a tape, the Eighth Circuit has suggested that "a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence." Griffin, 922 F.2d at 1355 n. 15; see also United States v. Longbehn, 950 F.2d 450, 451-452 (8th Cir. 1988). We review a shelter on Red Lake to be near akin. There Ms. Gillmore had a home, but not the comforts thereof, and thus our case is distinguishable from Czichray, where the FBI Agents repeatedly told the defendant (eight times) he was free to leave his comfortable suburban residence, that he could stop anytime. 378 F.3d at 826. Ms. Gillmore had no such control or freedom of choice.

6. The arrest after questioning.

That happened.

**B. The Second Interrogation**.

The delay in bringing Ms. Gillmore before Magistrate Burg in Bemidji was intentional and surely unnecessary. We sympathize to a limited extent that the Magistrate there would want the hearing at the end of the day, thus avoiding conflict with his normal workaday life. But Rule 5(a), Fed. R.Crim.P., isn't written so that a lawyer in Bemidji cannot be bothered until a certain moment of convenience. The

Rule requires the defendant's initial appearance to occur without "unnecessary delay." An unnecessary delay is determined in light of the facts and circumstances of each case, with the Court considering the amount of time passed and the reason therefore. Mallory v. United States, 354 U.S. 449, 455 (1957); see also United States v. Nazarenus, 983 F.2d 1480, 1482-83 (8th Cir. 1993); United States v. Pugh, 25 F.3d 669, 675 (8th Cir. 1994). Secondary factors include the location of the Magistrate Judge, and the transportation of the defendant. 18 U.S.C. 3501 (c). Federal involvement in Ms. Gillmore's arrest triggers the Rule 5 requirements. See United States v. Chevre, 146 F.3d 622, 624 (8th Cir. 1998).

The federal statute suggests six hours is reasonable. 18 U.S.C. 3501 (c). That period is measured from the time Ms. Gillmore is arrested to her initial appearance. United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994); United States v. Clarke, 110 F.3d 612, 615 (8th Cir. 1997). Our gap is twenty-four hours and too long.

Bemidji is thirty minutes from Red Lake. The Magistrate is in the same small town. There was no excuse to wait. The appearance could have happened by the early morning. Instead, the Agents took another run at a vulnerable defendant, who succumbed to their persistence, describing the murder to her everlasting prejudice.

Where, as here, a confession is secured as a result of an unnecessary delay of

over six hours, suppression is the remedy, a remedy premised upon this Court's supervisory authority. McNabb v. United States, 318 U.S. 332, 347 (1943); Mallory, 354 U.S. at 455-56; 18 U.S.C. 3501.

Dated:

/s/ Paul Engh

Paul Engh
Suite 215 220 South Sixth Street
Minneapolis, MN 55402
(612) 252-1100

Attorney for Ms. Gillmore