UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 02-85 (DWF/RLE)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CAROL LOUISE GILMORE,<br><br>Defendant. | ) | GOVERNMENT'S MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS |

STATEMENT OF FACTS

The defendant was interviewed twice by Special Agent John Egelhof of the FBI. First, on February 14, 2002, at the Women's Shelter on the Red Lake Indian Reservation. At the conclusion of this interview, the defendant was arrested. Second, on February 15, 2002, at the Beltrami County Jail in Bemidji, Minnesota. Special Agent Egelhof gave the defendant a Miranda warning before the interview. After the interview, the defendant made her first appearance before the part-time magistrate judge at the Beltrami County Courthouse.

At the first interview, Special Agent Egelhof with Red Lake CI Jason Lawrence went to the Shelter to speak with the defendant. The defendant was there with her advocate. Special Agent Egelhof asked the defendant to speak about something that happened earlier that day. The defendant was told that she was not under arrest and did not have to speak with the interviewers. The defendant agreed to speak with the interviewers and asked that her advocate be present. The interview took place in a conference room of the shelter. The door was closed but not locked. The interviewers

were dressed casually. They were armed however, there is no evidence that a weapon was displayed to the defendant. Special Agent Egelhof believed that his duty weapon was hidden under his clothing, consistent with his usual practice. Though, he can't specifically recall his dress on that day. At the conclusion of the interview, Special Agent Egelhof took leave of the conference room to call the U.S. Attorney's Office. After the call, the defendant was arrested and transported to the Red Lake Tribal Jail.

The second interview took place at the Beltrami County Jail on February 15, 2002. The defendant had been transported from the Red Lake Tribal Jail earlier that afternoon. Before the interview the defendant was given an Advice Rights Form which she signed. After she was advised of her Miranda rights, she made a second statement. After the second statement, she was taken for a first appearance before the magistrate judge.

Special Agent Egelhof testified that the defendant could not be presented to a magistrate judge on February 14, 2002, because of the hour of her arrest. The magistrate judge in Bemidji was not available until 4:00 p.m. on February 15, 2002. The magistrate judge worked part time and was not available until the end of the day. Also, the courtroom was borrowed from the State of Minnesota and not available until the end of the day.

ARGUMENT

I. The Motion to Suppress Defendant's Statement on February 14, 2002, Should Be Denied Because There Was No Miranda Violation as She Was Not in Custody.

"'[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003) (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Whether a defendant is in custody during questioning is determined on the totality of the circumstances. United States v. Axsom, 289 F.3d at 496, 500 (8th Cir. 2002).

"Custody occurs when a suspect is deprived of his freedom of action in any significant manner." Id. (citing United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990); Miranda v. Arizona, 384 U.S. 436, 444 (1966)). "If [a defendant] believed his freedom of action had been restrained to a 'degree associated with formal arrest' and his 'belief was reasonable from an objective viewpoint,' then [the defendant] was 'held in custody during the interrogation.'" Axsom, 289 F.3d at 500 (quoting Griffin, 922 F.2d at 1347).

The Eighth Circuit has developed a non-exhaustive list of six common indicia of custody. Wolk, 337 F.3d at 1006. These six factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do

> so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. (quoting United States v. Wallace, 323 F.3d 1009, 1112 (8th Cir. 2003)). In applying these factors, the Court employs a balancing test. Id. "A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." Axsom, 289 F.3d at 501.

There are three cases from this Circuit with facts similar to the present case where this Court found that a suspect was not in custody: United States v. Helmel, 769 F.2d 1306 (8th Cir. 1983); United States v. Axsom, 289 F.3d 496 (8th Cir. 2002), and United States v. Sutera, 933 F.2d 641 (8th Cir. 1991). A comparison of those cases to this case shows that the defendant was not in custody during the February 14, 2002 interview.

**A. A Comparison of This Case with Similar Eighth Circuit Cases Supports The Conclusion that the Defendant Was Not in Custody During the February 16, 2001 Interview.**

The facts in this case are much less favorable to the defendant than the facts in Helmel, Axsom, or Sutera. Each of these cases is examined in turn.

In Helmel, this Court found a statement voluntary when an agent telephoned the suspect and requested that he come home. When the defendant arrived, he was searched and ordered into the kitchen where he was escorted by several agents. Agents then answered all incoming calls and interrogated the defendant over several hours. Under these facts, the Helmel Court stated:

> It is true that [the agent] answered all incoming telephone calls while the search and interview progressed, but we fail to see how this created a coercive atmosphere. . . . [W]hile the search of the residence "added some coercive aspects, all official questioning . . . has some coercive aspects." . . . [W]e consider it significant that Glick was specifically informed by the agents that he was not under arrest. . . . The circumstances surrounding [the defendant's] interview, when considered in light of established precedent, indicate that [he] was not in custody at the time of his admissions.

Helmel, 769 F.3d at 1320-21 (citations omitted).

In Axsom, federal agents executed a search warrant on a residence in the early morning. When the defendant arrived at the door, he was wearing only a towel. Nine federal agents and other employees entered the residence and directed the defendant to secure the defendant's dogs outside. The agents also saw numerous weapons. Once the dogs and weapons were secured, the agents directed the defendant to sit down, told him they had a search warrant, and informed him that he was not under arrest. Only after the defendant agreed to speak with the agent did the federal agents escort the defendant to the bedroom to dress. After dressing, the defendant returned to the living room and sat down on an easy chair

across from the agents. When the defendant requested a glass of water, the agents did not allow the defendant to get a glass of water but had other agents bring him water. When the defendant expressed a need to use the bathroom, agents escorted him for security reasons. The execution of the search warrant took approximately two hours. After the interview, and while the agents continued their search, the defendant moved about his residence, answered the telephone, and smoked his pipe. The agents maintained control of the defendant's movements around the residence based on security concerns. Axsom, 289 F.3d at 497-99.

The Axsom Court found that the defendant was not in custody. Analyzing the facts, the Eighth Circuit concluded that "a reasonable person would have felt he was at liberty to terminate the interrogation and walk away or turn his back on the agents." Id. at 503.

In Sutera, six special agents went to the defendant's apartment to execute a search warrant for, among other things, the residence and person of Sutera. The defendant was informed that he was not under arrest, that he did not have to answer questions, and that he could leave at any time. The agents interviewed the defendant in the bedroom to keep him separate from a co-suspect. The defendant was accompanied as he moved about the apartment and was not allowed to use the telephone. The agents spent three and one-half hours executing the entire search warrant and one hour interviewing the defendant. The Eighth Circuit, analyzing these

facts, found no "evidence showing conduct by the officers which would lead to the conclusion that Sutera was in custody." Sutera, 933 F.2d at 648.

In all three of these case, this Court applied the six Griffin factors and found that under those circumstances (certainly presenting a more compelling situation than the facts in this case) the defendants' statements were voluntary and non-custodial. In light of these cases, the District Court erred in making the legal conclusion that the defendant was in custody during the February 16, 2001 interview.

**1. It is undisputed that the defendant was repeatedly advised that the interview was voluntary, that she was free to end the interview at any time.**

Special Agent Egelhof testified that he informed the defendant that she was not under arrest and did not have to speak with him.

**2. The defendant's freedom of movement about the shelter was not restrained to the extent that a reasonable person would believe he was in custody.**

The interview took place in a conference room of the shelter. The door was closed but unlocked. There is no evidence that the defendant's freedom of movement was restricted.

**3. While the FBI agents initiated the contact, the defendant voluntarily acquiesced to the questioning.**

Special Agent Egelhof testified that the defendant agreed to be interviewed. The defendant asked that her advocate be allowed

to be present. Her presence demonstrated that the interview was voluntary.

**4. The FBI agent did not use strong arm tactics in questioning the defendant.**

It is not clearly defined what constitutes a strong arm tactic for purposes of custody. Cases analogous to the present case, addressing voluntariness, demonstrate that the agents' tactics in this case were appropriate and not coercive. In United States v. Astello, 241 F.3d 965, (8th Cir. 2001), the Eighth Circuit explained:

> [I]interrogation of a suspect will involve some pressure because its purpose is to elicit a confession. . . . "Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne."

Id. at 967-68 (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)); accord United States v. Santos-Garcia, 313 F.3d 1073 (8th Cir. 2002). Confrontation of a suspect with evidence of guilt is also not coercive. United States v. Cody, 114 F.3d 772, 776 (8th Cir. 1997); accord United States v. Moreno-Flores, 33 F.3d 1164, 1170 (9th Cir. 1994). Finally, assertions by agents that they would conduct a full scale investigation of the defendant if he did not cooperate are not coercive. United States v. Pelton, 835 F.3d 1067, 1072-73 (4th Cir. 1987); United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (confession voluntary despite agent's

suggestion that defendant's girlfriend would be considered a suspect unless suspect cooperated).

**5. The atmosphere of the questioning was not dominated by the FBI agents.**

The atmosphere of questioning was not dominated by the FBI agents. The interview took place in a conference room of the shelter where the defendant lived. "When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." Axsom, 289 F.3d at 502; see also Wolk, 337 F.3d at 1007 (finding no custody because, in part, "[t]he "questioning took place at [the defendant's] own home"); Helmel, 769 F.2d at 1320 (explaining that while a house setting can be coercive, "such is not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation"). The door to the conference room was closed but not locked. Finally, the defendant asked that her advocate remain during the interview and the FBI allowed this request.

**6. The defendant was arrested at the conclusion of the statement.**

II. The Defendants Motion to Suppress Should Be Denied Because the Defendant Knowingly and Intelligently Waived Her Sixth Amendment Right to Counsel Because She Had Been Given Miranda Warnings and the Delay Between Defendant's Arrest and Her Initial Appearance Did Not Constitute an Unnecessary Delay.

The present case is similar to the facts found in United States v. Rivera, 370 F.3d 730, 732 (8th Cir. 2004). The defendant was held overnight before he was presented to a magistrate judge.

Id. at 734. "Although he was subject to an overnight detention, this detention was reasonable considering his late-evening arrest and his desire to cooperate." Id. "The record shows that Rivera chose to cooperate and that the detention was not a charade conducted for the sole purpose of investigating Rivera's other crimes." Id. In the present case there has been no showing that the defendant's first appearance was delayed for an improper purpose.

The Eighth Circuit has held that a two hour delay was excessive. United States v. Davis, 174 F.3d 941, 943 (8th Cir. 1999). In Davis, the defendant's presentment was delayed to allow federal agents to investigate her involvement in other federal gun offenses. Id. That is not at issue here. There has been no showing that the delay in the present case was motivated by a desire to uncover additional evidence or investigate the defendant's involvement in other crimes. Id. Therefore, Davis, is not applicable. The delay was caused solely by the availability of the magistrate judge and courtroom in Bemidji, Minnesota.

The defendant was arrested in the late afternoon of February 14, 2002. It was too late to arrange for an appearance before the part time magistrate judge in Bemidji. The defendant was transported and housed in the Red Lake Tribal Jail for the night. The defendant was transported to Bemidji, Minnesota, for an initial appearance on February 15, 2002, at 4:00 p.m.

As the court is aware, there is no federal courthouse in Bemidji, Minnesota. The magistrate judge in Bemidji works part time. State district court courtrooms are used for initial appearances. The courtrooms and magistrate judge are not available until after the work day is complete. A 4:00 p.m. appearance was the first available time for an initial appearance.

CONCLUSION

The defendant was not in custody on February 14, 2002, when she spoke with Special Agent John Egelhof of the FBI. Therefore, a Miranda warning was not necessary. The defendant's statements on February 15, 2002, was a voluntary statement given after Special Agent Egelhof gave here a Miranda warning. Finally, the defendant was presented to a magistrate judge without undue delay.

For the foregoing reasons, the defense motion to suppress the defendant's statements should be denied.

Dated: 27 July 2005

THOMAS B. HEFFELFINGER
United States Attorney

s/Clifford B. Wardlaw

BY: CLIFFORD B. WARDLAW
Assistant U.S. Attorney
Attorney I.D. No. 183908