UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.                                        REPORT AND RECOMMENDATION

Carol Louise Gillmore,

        Defendant.               Crim. No. 02-85 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(A), upon the Defendant's Motions to Suppress Evidence of Search

and Seizure, and to Suppress Evidence of Statements.  A Hearing on the Motions was

conducted on July 12, 2005,[1] at which time, the Defendant appeared personally, and

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendants' Motions to Suppress.  Leave was granted, and the last submission on the issues was received on July 27, 2005, at which time, the Motions were taken under advisement.  See, <u>Title 18 U.S.C. §3161(h) (1)(F) and (J)</u>; <u>Henderson v. United States</u>, 476 U.S. 321, 330-32 (1986); <u>United States v. Blankenship</u>, 67 F.3d 673, 767-77 (8th Cir. 1995).

by Paul C. Engh, Esq., and the Government appeared by Clifford B. Wardlaw, Assistant United States Attorney.   For reasons which follow, we recommend that the Defendant's Motions to Suppress be denied.

## II.  Factual and Procedural Background

In a four-Count Indictment, the Defendant is charged with one Count of Felony Murder in the First Degree, in violation of Title 18 U.S.C. §§1111(a), 1151 and 1153(a); one Count of Premeditated First Degree Murder, in violation of Title 18 U.S.C. §§1111(a), 1151 and 1153(a); one Count of Intentional Second Degree Murder, in violation of Title 18 U.S.C. §§1111(a), 1151 and 1153(a); and one Count of Arson, in violation of Title 18 U.S.C. §§81, 1151 and 1153(a).   As pertinent to these charges, and to the Defendant's Motions to Suppress, the operative facts may be briefly summarized.[2]

---

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."   As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.   Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the facts and law may require.   See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

At approximately 8:19 o'clock a.m., on February 14, 2002, the Red Lake Police Department ("RLPD") received a report from a citizen, which advised that smoke was seen rising from the residence of George A. Stately ("Stately"), who was an enrolled member of the Red Lake Band of Chippewa Indians, and who resided within the exterior boundaries of the Red Lake Indian Reservation.  Members of the Red Lake Fire Department responded first, and found the home ablaze.  Firemen broke into the home and discovered the body of Stately in the living room of the residence.  After determining that Stately had died, and that he appeared to have been a victim of a crime, the firemen exited the home, after extinguishing the fire, and securing the residence.

John P. Egelhof ("Egelhof"), who is a Special Agent with the Federal Bureau of Investigation ("FBI"), proceeded to the Stately residence, along with Timothy Ball ("Ball"), who is another FBI Special Agent, and Jason Lawrence ("Lawrence"), and Donovan J. Wind, Sr., who are Criminal Investigators with the RLPD.  The officers observed a trail of apparent blood stains leading from the back door to the middle of the back parking area, where a set of tire tracks reflected that a motor vehicle had been parked in the back of the residence, had backed up, and then had left the yard.  What

appeared to be blood stains were also found on the back door and screen door to the home.

Egelhof observed that the interior of the house was heavily damaged from smoke and heat.  A rear bedroom was heavily damaged by fire, and a fire had been ignited on the kitchen table, but had been extinguished.  Stately's body was laying on the floor of the living room, with a hammer, a kitchen knife, and a portion of newspaper on his body.  A significant trauma injury to the back of his head was observed, as were possible trauma injuries to his face and head.  The officers did not determine the full extent of Stately's injuries, due to the smoke damage to his body.  His body was in rigor mortis, and was cold to the touch.  When the hammer and knife were removed from Stately's body, Egelhof noted that they had been soaked in what appeared to be dried blood, and the hammer had blood-matted hair affixed to it.  The portion of newspaper had a small spot where it appeared to have been set afire.

Large amounts of blood splatter were observed on the walls, floor, and furniture near Stately's body.  Some blood splatters were also found on the kitchen table.  Several items of furniture in the living room were in disarray, suggesting that a physical struggle had taken place both in the living room, and in the laundry room area.  The firemen assured Egelhof that they had not moved the furniture when extinguishing the

fire.  Egelhof found a battery-powered analog clock in the kitchen whose plastic frame had become deformed from the heat, with the hands of the clock stopped at several minutes before 10:00 o'clock.  Although Stately was known to possess firearms in his house, none were located in the residence.

Further investigation revealed that Stately had left the Seven Clans Casino, which is located across the street from his home, at approximately 8:30 o'clock p.m., and had went home.  There, he received a telephone call from a friend.  During the course of the telephone call, Stately interrupted the conversation to advise that someone was at his door.  Stately was overheard to say "Yo!", followed by the statement "Hi, Carol.  What are you doing here."  The friend got the impression that, in response to the "Yo!," someone had entered Stately's house.  Stately then advised his friend that he would call her back, but he never did.  Subsequent investigation uncovered a "Caller ID" box, which revealed that Stately's friend had initiated the telephone call at 9:25 o'clock p.m., on February 13, 2002.

The investigation led officers to believe that "Carol" might be a resident at Equae Wii Ga Women's Shelter ("Shelter") -- namely, the Defendant -- who was known to be associated with Roman "Ducker" Stately, who was Stately's brother.  Ball and Lawrence proceeded to the Shelter, where personnel informed them that the

Defendant resided there, that blood had been observed on the door frame to her room, and that the Shelter's logs recorded that the Defendant had left the shelter at 9:00 o'clock p.m., on February 13, 2002, and had returned at 10:10 o'clock p.m. The officers proceeded to the Defendant's room, where they observed what appeared to be blood on her door frame, and found what appeared to be blood splatters or drops in the communal shower, and on the communal washing machines.

Egelhof then proceeded to the Shelter, where he and Lawrence approached the Defendant, and the Defendant's advocate at the Shelter, and asked if she would consent to questioning, which she agreed to do. Initially, the Defendant stated that she had left the shelter on the previous evening about 8:30 o'clock p.m., in order to provide a fellow Shelter resident, and the resident's son, a ride to a store, then returned to the Shelter, only to leave in order to visit her uncle. According to the Defendant, her uncle was not home and, because a tire on her vehicle was wobbling, she went to Stately's home. Stately came out of his home, checked her tire pressure for her, after which she left to return to the Shelter. She denied entering Stately's home, and further denied having any sort of confrontation with him. She stated that there was no reason for her blood and fingerprints to be inside of Stately's home, or in his back yard, and that the only injury she had recently suffered was from hitting her head on the steering

wheel of her car during a suicide attempt earlier in the day.  Egelhof observed that the

Defendant had a slight bruise on the bridge of her nose, and slight swelling on the side

of her temple.

Subsequently, the Defendant admitted that she had lied to the officers, and that

she had gone to Stately's home the previous evening to get her tire checked, and to

tell him that she would repay some money she owed him later in the week.  She went

into Stately's home for a drink of water, where he made a sexual advance by grabbing

her breasts, and subsequently, by striking her in the face and head.  A struggle ensued

between the Defendant and Stately, during which Stately obtained a kitchen knife, and

cut the Defendant's hand.  The Defendant informed Egelhof that she was fearful that

Stately was going to rape her, and reported that she had been raped twice in the past

year.  The Defendant picked up a hammer she found with other tools in the laundry

room, and hit Stately with it.  As recounted by the Defendant, Stately grabbed the

hammer and attacked her with it, but she was successful in wrestling the hammer away

from him, after he had struck her in the head with it.

The Defendant informed Egelhof that "everything went red," and she could not

recall how many times she had hit Stately, or if she had inflicted any wounds upon him

with the knife.  She found Stately laying on the floor, and did not know what to do,

so she set fire to the bedroom, and may have set a fire on the kitchen table, but she could not recall clearly if she had.  She could not explain why there were so many blood splatters at the scene, nor could she recall if she had hit Stately in the back of the head.  After setting fire to Stately's house, the Defendant went to her uncle's home but, finding no one there, she returned to the Shelter.  She stated that she managed to elude observation by the Shelter desk worker, and then went to her room, removed her bloody clothing, took a shower, and washed her clothes, which she secured in her room at the Shelter.

Based upon the foregoing information, which Egelhof reduced to written Affidavits[3] in support of a Search Warrant, a United States Magistrate Judge issued three Search Warrants -- one for the Defendant's room at the Shelter, one for her motor vehicle, and one for DNA samples from her person.  The Defendant seeks to suppress the evidence secured by these Search Warrants, relying upon our review of the "four corners" of the respective Warrants, and supporting papers.

---

[3]In substance, Egelhof's three Affidavits were nearly identical, with the only differences referring to the nexus between the foregoing facts and the place, or objects to be searched.

In addition, the Defendant seeks to suppress two statements she provided to Egelhof. Egelhof supplemented the information, which is contained in his Affidavits in support of the Search Warrants, as it pertains to the Defendant's statements on February 14, and February 15, 2002, with the testimony that he provided at the Suppression Hearing. Egelhof testified that, when he arrived at the Shelter, he asked to see the Defendant. At that time, Egelhof was in the company of Lawrence. The Defendant appeared with Mary Parkhurst ("Parkhurst"), who was the Defendant's advocate at the Shelter. Egelhof identified himself, and advised the Defendant that he wanted to talk to her about her activities of the previous day. Egelhof advised that the Defendant was free to leave, and that she was not required to talk to him. The Defendant informed Egelhof that, earlier that day, she had attempted suicide by driving into an oncoming tractor-trailer truck, and that she had gone to a health care facility, in order to be injected with Ativan, which is an anti-anxiety medication.

As related by Egelhof, the Defendant stated that she was on her way to a mental health facility in Thief River Falls, Minnesota, together with Parkhurst, but she agreed to speak with Egelhof. The interview lasted approximately one hour, and occurred in a break room at the Shelter. The break room had several doors, which were closed but not locked. Both Egelhof, and Lawrence, were armed, but Egelhof did not believe

that his firearm was visible.  The participants were seated such that Egelhof had his

back to the door, with the Defendant facing him.  During the interview, the Defendant

made inculpatory statements, which caused Egelhof to telephone an Assistant United

States Attorney, who counseled Egelhof to arrest the Defendant in connection with the

death of Stately.    According to Egelhof, the Defendant appeared to respond

appropriately to his questions, was generally calm during the course of the interview,

although, at one point, she was crying.  At one point in the interview, Egelhof told the

Defendant she would not be injured, or harmed, but he never advised her that she

would not be charged in the matter.  After her arrest, the Defendant was taken to the

Red Lake Reservation Jail.

On the following day, the Defendant was transported, at approximately 3:00

o'clock p.m., from the Red Lake Reservation Jail, to the Beltrami County Jail, in order

that she could make her Initial Appearance before a Magistrate Judge sitting in Bemidji,

Minnesota.  Egelhof, along with two Red Lake Police Department officers, met the

Defendant at the Beltrami County Jail.  After advising the Defendant of her Miranda

rights, see Miranda v. Arizona, 384 U.S. 436 (1966), the Defendant signed an "Advice

of Rights" form, see Government Exhibit 2, and agreed to speak with Egelhof.  As

related by Egelhof, the Defendant appeared to be in the same state of calm as she had

been on the previous day.  When during that interview, on February 15, 2002, she refused to answer certain of Egelhof's questions, he concluded the interview, started her processing on a Federal Criminal Complaint, and took some biological samples from her person, pursuant to a Search Warrant.  At approximately 4:00 o'clock p.m., on February 15, 2002, the Defendant was presented to the Magistrate Judge in Bemidji -- about twenty four (24) hours after her arrest on the previous day.  According to Egelhof, the Magistrate Judge in Bemidji scheduled his Magistrate Judge duties for the later afternoon, as he also served as a full-time County Prosecutor, and had to rely on the State Court, in Bemidji, in order to schedule any Hearings, and the late afternoon allowed such a scheduling.  Egelhof acknowledged his belief that, if the Defendant appeared before the Magistrate Judge and was appointed legal counsel, it was unlikely that she would provide any statement to law enforcement.

The Defendant urges that, as to the interview on February 14, she was in custody, and should have been provided a Miranda warning, and in the absence of such a warning, her statement on that date should be suppressed.  As to her statement to Egelhof on February 15, the Defendant maintains that her appearance before the Magistrate Judge, in Bemidji, had been impermissibly delayed, so as to deprive her of

the opportunity to have counsel appointed before her statement was made. As a result, the Defendant also seeks to suppress her statement on that date.

## III. Discussion

A. The Motion to Suppress Evidence of Search and Seizure.

1. Standard of Review. The Fourth Amendment requires that "a search warrant must be issued by a neutral and detached magistrate," Technical Ordnance Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001), citing Johnson v. United States, 333 U.S. 10, 13-14 (1948), who will "assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband." United States v. Winningham, 953 F. Supp. 1068, 1077 (D. Minn. 1996), citing Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995). A finding of probable cause must be based upon a consideration of all of the circumstances set forth in the supporting Affidavit, and is proper when a "'fair probability [exists] that * * * evidence of a crime will be found in a particular place,'" or when "'a substantial basis [exists] for * * * conclud[ing]' that a search would uncover evidence of wrongdoing." United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999), quoting Illinois v. Gates, 462 U.S. 213, 236, 238 (1983), quoting, in

turn, Jones v. United States, 362 U.S. 257, 271 (1960); see also, United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).

Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts" and, as such, is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, supra at 232; see also, Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001); Ornelas v. United States, 517 U.S. 690, 697 (1996).  In considering the issuance of a Search Warrant, probable cause must be viewed under a reasonableness standard, "the touchstone of the Fourth Amendment," which "is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996), quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991).

Search Warrant "[a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998); United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993). "In conducting such an examination, the Court should review the affidavits as a whole, and not on a paragraph-by-paragraph basis." United States v. Winningham, supra at 1077, citing United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); United

States v. Townsley, 843 F.2d 1070, 1076-77 (8th Cir. 1988).   Under the Fourth Amendment's preference for searches conducted pursuant to Warrants, see, Illinois v. Gates, supra at 236, Courts reviewing Search Warrants are to "accord great deference to the decision of the Judicial Officer who issued the Warrant," and must not engage in a de novo review.   United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995); see also, Walden v. Carmack, supra at 870.

2.   Legal Analysis.   Given the averments in Egelhof's Affidavit in support of the issuance of Search Warrants, there is unquestionably probable cause for the search of the Defendant's room at the Shelter, her person for biological samples, and her car. She was not only implicated in Stately's death by circumstantial evidence, but she made admissions in the nature of a confession.   Blood evidence was observed on her motor vehicle, and on the door casing to her room at the Shelter, as well as in the common areas for showers, and laundry.   As to those common areas, Egelhof testified that the director of the Shelter provided him with consent to search those portions of the premises.

The Warrants which issued were sufficiently particularized, as to both the places to be searched, and the objects to be seized, the Defendant draws no other infirmity in the Warrant to our attention, and our own independent review fails to disclose any.

- 14 -

Accordingly, we recommend that the Defendant's Motions to Suppress the evidence

obtained by Search Warrant, and by the consented search of the common areas at the

Shelter, be denied in all respects.

B.      The Motion to Suppress Evidence of Statements.

        As we have related, the Defendant advances different bases to suppress her

statements of February 14, and 15, 2002, and therefore, we address those bases

separately.

        1.      The Defendant's Statement on February 14, 2002.

                a.      Standard of Review.   Government agents are not required to

administer Miranda warnings to everyone whom they question.   See, Oregon v.

Mathiason, 429 U.S. 492, 495 (1977).   Rather, Miranda warnings are required for

official interrogations where a person has been "'taken into custody or otherwise

deprived of his freedom of action in any significant way.'"   Stansbury v. California,

511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444; United States v.

Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420,

428-29 (1984).

        Whether an accused was subjected to custodial interrogation is to be determined

from the totality of the circumstances.   See,  United States v. Hanson, 237 F.3d 961,

963 (8ᵗʰ Cir. 2001); <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).  In determining whether a suspect is "in custody," we examine whether the extent of the physical or psychological restraints, which were imposed upon the Defendant, during an interrogation by law enforcement, would have been understood by a "reasonable person in the [Defendant's] position" as being consonant with the condition of being in custody.  <u>Berkemer v. McCarty</u>, supra at 442; <u>United States v. Cates</u>, 251 F.3d 1164, 1166 (8ᵗʰ Cir. 2001); <u>United States v. Carter</u>, 884 F.2d 368, 370 (8ᵗʰ Cir. 1989).  As the Court in <u>United States v. Griffin</u>, 922 F.2d 1343, 1357 (8ᵗʰ Cir. 1990), stated: "If [the Defendant] believed his freedom of action had been curtailed to a 'degree associated with formal arrest,' and that belief was reasonable from an objective viewpoint, then [the Defendant] was being held in custody during the interrogation." See also, <u>Stansbury v. California</u>, supra at 1529; <u>United States v. Chamberlain</u>, 163 F.3d 499, 503 (8ᵗʰ Cir. 1998).

Under the law of this Circuit, the relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation.  See <u>United States v. Griffin</u>, supra at 1349.  The most comprehensive list of factors -- although admittedly not exhaustive -- was enumerated, as follows, in <u>United States v. Griffin</u>, supra at 1349:

> [The] inquiry into the indicia of custody has generally focused on an examination of (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The Court has regarded the first three of the Griffin factors as mitigative in their effect upon the ultimate determination, for the presence, during questioning, of one or more of those factors would tend to weigh against a finding of custody. On the other hand, the remaining three factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody. A "finding of custody does not, however, have to be supported by all six factors." United States v. Galceran, 301 F.3d 927, 930 (8th Cir. 2002), citing United States v. Griffin, supra at 1349; see also, United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996).

If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning." Davis v.

United States, 512 U.S. 452, 457 (1994).  "The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'"  Davis v. United States, supra at 458, quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981). Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him."  Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).  The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights.  See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987).  However, "Miranda has no application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response."  United States v. Griffin, supra at 1357, citing United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8th Cir. 1985).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's

right against self-incrimination.  See, <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34

(2000).  For a confession to be considered voluntary, a Court must examine "'whether

a defendant's will was overborne' by the circumstances surrounding the giving of a

confession."   <u>Dickerson v. United States</u>, supra at 434, citing <u>Schneckloth v.</u>

<u>Bustamonte</u>, 412 U.S. 218, 226 (1973).

        As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality
> of all the surrounding circumstances -- both the characteris-
> tics of the accused and the details of the interrogation."
> [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also
> Haynes [v. Washington, 373 U.S. 503, 513] (1963);
> Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v.
> Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances
> attendant upon the confession must be taken into account");
> Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all
> the attendant circumstances indicate that the confession was
> coerced or compelled, it may not be used to convict a
> defendant").    The determination "depend[s] upon a
> weighing of the circumstances of pressure against the power
> of resistance of the person confessing."   Stein v. New
> York, [346 U.S. 156, 185] (1953).

<u>Id.</u> at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a <u>Miranda</u> warning has been given, see, <u>Withrow v. Williams</u>, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, <u>Colorado v. Connelly</u>,

479 U.S. 157, 167 (1986); the length of the interrogation, see, <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, <u>Reck v. Pate</u>, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, <u>Leyra v. Denno</u>, 347 U.S. 556, 561 (1954). See also, <u>Withrow v. Williams</u>, supra at 693 (listing the applicable considerations).

      b.    <u>Legal Analysis</u>. With the exception of being arrested at the close of the interview, none of the <u>Griffin</u> factors weighs in favor of a finding of custody. First, Egelhof testified, without contradiction, that he informed the Defendant, on February 14, that she was free to leave the interview at any time, and that she did not have to speak with him. Although the Defendant emphasizes that she was on her way, with Parkhurst, to a mental health clinic in Thief River Falls, she agreed to speak with Egelhof, appeared to understand the questions posed, and was calm throughout the interview, with the exception of crying at one point.

Second, the Defendant was not restrained during the course of the interview. While the interview occurred in a break room whose doors were closed, the doors were not locked, and the Defendant was present in the company of her advocate at the Shelter. There is no suggestion, let alone evidence, that the Defendant asked to leave

the room, and was denied such permission, or that she was otherwise compelled to participate in the questioning.

Third, it is clear that the Defendant did not initiate the contact with law enforcement, but we find, by a preponderance of the evidence, that she acquiesced in Egelhof's questioning.  Had she wanted to leave the break room, and travel for medical treatment in Thief River Falls, she certainly did not make that request to either Egelhof or, on this Record, to Parkhurst.  Fourth, there is no evidence of any strong arm tactics or deceptive stratagems.  What appears in this Record is the Defendant's consent to be questioned, while she was in the company of her own advocate.  Fifth, it cannot be said that the atmosphere of the interview was "police dominated."  While Egelhof was in the company of Lawrence, the Defendant was in the company of her advocate, who was not asked to leave the break room.

Lastly, the Defendant was arrested at the close of the interview, owing to her incriminating statements, but otherwise the Griffin factors counsel a finding that the Defendant was not in custody.  Here, she was in the familiar surroundings of a break room in the Shelter, she was accompanied throughout the interview by her advocate, and she appeared to understand the questions being posed.  We are mindful that the Defendant was under medication during the interview, but Egelhof testified that she

appeared to be comprehending the questions and events during both interviews.

Accordingly, we find and conclude that the Defendant was not in custody during the

interview of February 14, 2002, and that her Fifth Amendment rights were not violated

by Egelhof's failure to provide her a <u>Miranda</u> warning on that occasion.  Therefore,

we recommend that the Defendant's Motion to Suppress her statement of February

14, 2002, be denied.

      2.    <u>The Defendant's Statement of February 15, 2002</u>.

      a.    <u>Standard of Review</u>.  Noting that some twenty-four (24) hours had

elapsed between her arrest, and her initial appearance before a Magistrate Judge, the

Defendant contends that her statement to Egelhof, on February 15, should be

suppressed as violative of Rule 5(a), Federal Rules of Criminal Procedure, which

requires that a defendant's initial appearance occur without "unnecessary delay," and

Title 18 U.S.C. §3501(c), which provides as follows:

> In any criminal prosecution by the United States or by the
> District of Columbia, a confession made or given by a
> person who is a defendant therein, while such person was
> under arrest or other detention in the custody of any law-
> enforcement officer or law-enforcement agency, shall not be
> inadmissible solely because of delay in bring such person
> before a magistrate judge or other officer empowered to
> commit persons charged with offenses against the laws of
> the United States or of the District of Columbia if such

> confession is found by the trial judge to have been made
> voluntarily and if the weight to be given the confession is
> left to the jury and if such confession was made or given by
> such person within six hours immediately following his
> arrest or other detention: **Provided**, That the time limitation
> contained in this subsection shall not apply in any case in
> which the delay in bringing such person before such
> magistrate judge or other officer beyond such six-hour
> period is found by the trial judge to be reasonable
> considering the means of transportation and the distance to
> be traveled to the nearest available such magistrate judge or
> other officer.

[Emphasis in original].

Although creating a "safe harbor" for confessions that were made by a suspect within six (6) hours of his or her arrest, the provisions upon which the Defendant relies do not, per se, invalidate statements which have been provided after the six hour deadline. As our Court of Appeals stated, in United States v. Bear Killer, 534 F.2d 1253, 1256-57 (8th Cir. 1976), cert. denied, 429 U.S. 846 (1976):

> In United States v. Keeble, 459 F.2d 757 (8th Cir. 1972),
> rev'd on other grounds, 412 U.S. 205, 93 S.Ct. 1993, 36
> L.Ed.2d 844 (1973), we held that the critical inquiry into the
> admissibility of in-custody statements is whether, in the light
> of all the circumstances, they were voluntary. The delay
> between arrest and confession is a factor that must be
> considered in this inquiry. But a delay alone will not render
> a confession inadmissible. Notwithstanding the urgings of
> the appellant, we continue to adhere to Keeble. * * * In so
> doing, we repeat the Supreme Court's admonition that the
> simple fact of custody is coercive. It is a subtle form of

> pressure that plays against the will of a suspect, the effects
> of which are most difficult to measure.  Accordingly, the
> reasons for delay must be carefully scrutinized.    A
> statement given while in custody is not admissible if it is the
> product of an improper encroachment on the right to an
> initial appearance before a magistrate.

See also, United States v. Van Lufkins, 676 F.2d 1189, 1193 (8th Cir. 1982); United States v. Keeble, 459 F.2d 757, 761-62 (8th Cir. 1972), rev'd on other grounds, 412 U.S. 205 (1973); Grooms v. United States, 429 F.2d 839, 842-43 (8th Cir. 1970); United States v. Smith, 713 F. Supp. 1315, 1317 (D. Minn. 1989).

As a consequence, "[d]elay between arrest and presentment is only one of five factors a trial judge must consider when determining whether a confession was voluntary, see 18 U.S.C. §3501(b), but delay is not dispositive * * *."  United States v. Pugh, 25 F.3d 669, 675 (8th Cir. 1994).   Accordingly, in assessing the admissibility of a confession made after an arrest, we look to the following factors: "(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and (5) whether or not such defendant was

without the assistance of counsel when questioned and when giving such confession."

Title 18 U.S.C. §3501(b).   In making this assessment no one factor is conclusive, although "voluntariness, rather than delay, is the key factor."   United States v. Van Lufkins, supra at 1193, citing 1968 U.S. Code Cong. & Admin. News at 2127, 2167.

        b.    Legal Analysis.  Approximately twenty-four hours elapsed between the Defendant's arrest, on February 14, and her appearance before the Magistrate Judge, in Bemidji, on February 15.  During that interim, the Defendant was placed, for the majority of the time, in the Red Lake Reservation Jail, and was not subject to any questioning, at least as disclosed in this Record.  At about 3:00 o'clock p.m., a Red Lake Police Officer transported the Defendant to the Beltrami County Jail, where she was detained while awaiting her appearance before the Magistrate Judge.  Notably, well before her appearance at the Beltrami County Jail, the Defendant had made incriminating statements to Egelhof; statements which had led to her arrest.

First, we find that the delay, between the Defendant's arrest and her appearance before the Magistrate Judge, while lengthier than six (6) hours, was not unreasonable given the circumstances.  The timing of the appearance was the Magistrate Judge's decision, and not that of Egelhof.  Given the logistics -- there being no Federal Courthouse in Bemidji, and the Magistrate Judge's need to accommodate the hosting

- 25 -

State Court -- we cannot say that the delay was for the purpose of interrogating the Defendant.  See, United States v. Davis, 174 F.3d 941, 945-46 (8th Cir. 1999).  To be sure, Egelhof did not attempt to make special arrangements for an earlier appearance in this case, but his testimony is not contradicted that the Magistrate Judge routinely scheduled such matters for the late afternoon, when courtroom facilities are available to him, and when his full-time employment would allow.  Most of the delay, which was experienced by the Defendant, was related to her custody at the Red Lake Reservation Jail, where she was not questioned by Egelhof, or anyone else disclosed in this Record.

Further, we find that the Defendant's statement, on February 15, 2002, was a voluntary act on her part.  Egelhof's testimony is uncontroverted that he provided the Defendant with a Miranda warning, which she represented that she understood, and that she consented to speak with Egelhof by the signing of an "Advice of Rights" form.  As a consequence, the second, third, fourth, and fifth considerations, which are enumerated in Section 3501(b), "incline in favor of admitting [the Defendant's] statement."  United States v. Clarke, 110 F.3d 612, 615 (8th Cir. 1997).  Indeed, there can be little doubt that the Defendant understood those rights, as she later invoked them in order to terminate the interview.  There is no evidence of threats, promises, or

any other form of deception, or coercion, in Egelhof's interrogation of the Defendant, and as had been the case on the previous day, the Defendant appeared to Egelhof to understand the questions posed.  Other than the delay, which we have found to be reasonable, there is no evidence that the Defendant's confession was anything other than voluntary, and the delay, standing alone, does not persuade us that the Defendant's will was overborne.  Therefore, we recommend that the Defendant's Motion to Suppress Evidence of Statements be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motion to Suppress Evidence of Search and Seizure [Docket No. 54] be denied.

2.     That the Defendant's Motion to Suppress Evidence of Statements [Docket No. 55] be denied.

Dated:  August 1, 2005             *s/Raymond L. Erickson*
                                   Raymond L. Erickson
                                   UNITED STATES MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 18, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 18, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.