UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CR 02-85

UNITED STATES OF AMERICA,

PLAINTIFF,

v.

CAROL LOUISE GILLMORE,

DEFENDANT

---

**DEFENDANT'S OBJECTIONS TO THE REPORT AND RECOMMENDATION**

---

The defendant, Carol Louise Gillmore, consistent with 28 U.S.C. 636 and LR72.1 (c)(2), hereby objects to the Report and Recommendation of Magistrate Judge Raymond L. Erickson, dated August 1, 2005. A transcript has been ordered and produced and is on file.

Specifically, we object to the suggestion that Ms. Gillmore was not in custody during her first interview of February 14th, 2002. Report and Recommendation at p. 22. We also object to the recommendation that Ms. Gillmore's statement the following day, on the 15th, be admitted, despite the

evidence of an inexcusable delay in bringing her before a Magistrate Judge after she had been arrested. The delay was unnecessary within the meaning of statute and case law. Between the time Ms. Gillmore should have appeared and the time she did, the FBI secured her second confession.

**The facts**.

The Magistrate Judge took much of the slanted facts from the search warrant affidavits. At the contested hearing, the following was made of record.

On February 13, 2002, within the Red Lake Indian Reservation, the body of George Stately was discovered. He had been murdered, his home set aflame. (T. 23). F.B.I. investigation revealed that, while alive and over the telephone, Mr. Stately had greeted a “Carol” with the words, “what are you doing here.” (T. 25). Carol was identified as Ms. Gillmore. By the time Agent Egelhoff and Officer Jason Laurence arrived for their interview, blood stains had been observed on Ms. Gillmore’s car, her women’s shelter. (T. 25).

The two officials were armed. (T. 26). And informed that Ms. Gillmore had received an injection of Ativan earlier that morning. (T. 27). And were told that she was on her way to Thief River Falls for further medical attention. (T. 16, 27). They would see she had cuts on her hands, bruises on her head, her nose and face. (T. 35). Agent Egelhof’s intent was that Ms. Gillmore be interviewed before she sought

further medical care. (T. 28). She was not assured as to a limited amount of time for discussion, nor that she would be allowed to seek out the medical care she desired. (T. 29). The Agent mentioned to Ms. Gillmore that "no harm would befall her." (T. 31).

No formal waiver of rights was signed. (T. 28).

Ms. Gillmore was placed within a small room, the door shut, with Egelhof and Laurence between the door and their object of attention. (T. 29). After the one hour interview, Agent Egelhof phoned the United States Attorney's office in Minneapolis. He was instructed to arrest Ms. Gillmore and did so. (T. 30). He had planned to anyway. "I believe it was without doubt that she would be charged at some point." (T. 31).

Ms. Gillmore was then placed in the Red Lake jail, where she received no medical attention. (T. 32). The following day she was taken to the Beltrami County Jail in Bemidji, near 3:00 PM. (T. 32). By then, Egelhof had secured a formal written complaint and warrant. (T.18, 32). He'd scheduled a 4:00 PM appearance before Magistrate Judge Burg. (T. 32). The Magistrate, said Egelhoff, "made his own arrangements for times, and he would generally do it at a time after his normal work hours or close to the end of the day because he utilized one of the Beltrami County's courtrooms." (T. 21). The Magistrate Judge was not notified that Ms.

Gillmore was available at 3:00 PM, and instead the FBI conducted another interview, beginning at 3:14 PM. (T. 33). Agent Egelhof understood that, once Ms. Gillmore secured counsel, his chance at further questioning would be diminished at best. (T. 34).

There was a twenty-four hour gap between the time of Ms. Gillmore's arrest on the 14th, and her presentment on the 15th. (T. 21).

**The merits**.

**A. The first interrogation**.

Custody is a word that does not apply exclusively to a formal arrest, but whether a defendant is deprived of his freedom of movement in any significant way. California v. Beheler, 463 U.S. 1121, 1125 (1983); United States v. McKinney, 88 F.3rd 551, 553 (8th Cir. 1996). The "totality of the circumstances" are to be considered, United States v. Helmel, 769 F.2d 1306, 1320 (1985), "how a reasonable (woman) in the suspect's position would have understood (her) situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). This Court must look, of course, to "the objective circumstances" of the interrogation. Stansbury v. California, 511 U.S. 318, 323 (1994).

The six factors set out in United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), have long determined the "indicia of custody." Id. at 1349. This is the same

analysis employed in United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002), but recently discounted in United States v. LeBrun, 363 F.3d 715, 719 (8th Cir. 2004) (en banc), and United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004) (no requirement that the Griffin factors be followed "ritualistically"), cert. denied, 125 S.Ct. 2514 (2005). Nonetheless, the factors provide a construct used by the Magistrate.

The six factors to be considered:

1. Whether the suspect is told the questioning is voluntary and that she is free to leave and not under arrest;

2. Whether the suspect has unrestrained freedom of movement during the interrogation;

3. Whether the suspect initiated contact with the authorities or voluntarily acquiesced;

4. Whether strong arm tactics or "deceptive stratagems" were employed during the interrogation;

5. Whether the atmosphere of questioning was police dominated; and

6. Whether the suspect was placed under arrest when questioning was completed.

Griffin, 922 F.2d at 1349; United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003)

(citing the Griffin factors and noting they are "non-exhaustive").

We take each in seriatim, as did the Magistrate.

1. Advice given by Agents.

Agent Egelhof noted the interview was voluntary.

2. The freedom movement, to leave.

Similarly, Agent Egelhoff said he told Ms. Gillmore she was free to leave. But was she? Law enforcement officials sat between Ms. Gillmore (and her advocate) and the doorway. They were informed that she was about to attend to her medical needs. Let there be no dispute: the law enforcement officials stopped Ms. Gillmore with the thought of an extended conversation, leading in turn to an arrest, an indictment, the eventual motion hearing.

The measure of one's life is how close what one says matches what one does. Agent Egelhoff's conduct and verbiage dissociated. While the Agent may have intoned to Ms. Gillmore she was free to leave and so on and so forth, his nonverbal communication indicated he was there to stay. She was too. The Magistrate Judge disagreed. Report and Recommendation at p. 20.

It is this Court, however, that has the end responsibility to make findings "particularly as to witness credibility." United States v. Oropesa, 316 F.3d 762, 766 (8th Cir. 2002). There is no requirement that the Magistrate's contrary findings

be followed. United States v. Raddatz, 447 U.S. 667, 680 (1980) (noting the district court "alone acts as the ultimate decision-maker" and is allowed "broad discretion to accept, reject or modify the magistrate's proposed findings."). "[A]s a matter of sound administration of justice, the judicial actor is better positioned than another to decide the issue in question." Miller v. Fenton, 474 U.S. 104, 114 (1985)

3. Initial contact.

The F.B.I.'s conduct was designed in such a way as to control the initial contact, and hence that interview that would follow.

4. Strong arm tactics, the threat of arrest.

The tactic about which we complain concerns access to medical care. Ms. Gillmore has a history of mental illness. She received a shot of Ativan, an anti-anxiety drug, that morning. Given her tenuous condition, she was at the "complete mercy" of the agent, Mincey v. Arizona, 437 U.S. 385, 399 (1978), thus hardly free to go. He made her wait, talk, and ultimately confess while in immediate need of treatment. The Magistrate found no strong arm tactics. Report and Recommendation at p. 21. We respectfully differ.

5. Police domination.

Many law enforcement agencies use two police officers to dominate the interview, and this one was no different. See Miranda v. Arizona, 286 U.S. 436,

452 (1966) (noting law enforcement's historic proclivity toward tandem interviewers, the "friendly and unfriendly," the "mutt and Jeff"). Over thirty years ago, this unfair physical and psychological advantage persuaded the Supreme Court to mandate Fifth and Sixth Amendment warnings as a buffer. Id. at 449-458.

The most helpful trend in law of confessions after Miranda is practice of turning on a video and tape recorder. Where there used to be endless hearings about what was said to whom and how, nowadays a State Court Judge turns a switch on and makes a determination. The legal virtues of accountability and openness are thus served.

But the FBI still refuses to make a simultaneous recording, which is the great check on police overreaching when you think about it. Instead of having Agent Egelhof recount what he probably did three years ago, we would hear his voice, coupled with Ms. Gillmore's and we would all know for certain what was said. We would hear of Ms. Gillmore's trembling and tears, balanced against Egelhof's purported calm intensity, and we would make our own determination of the resulting dialectic.

That is not the way the FBI works, of course. Agents take advantage of a difference between state and federal law. Compare State v. Scales, 518 N.W.2d 587 (Minn. 1994) (requiring a tape record of defendant interviews) with United

States v. Molina, 172 F.3d 1048, 1059 (8th Cir. 1999) (law enforcement agent takes the investigation federal thereby avoiding a taping requirement).

Yet with or without a tape, the Eighth Circuit has suggested that "a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence." Griffin, 922 F.2d at 1355 n. 15; see also United States v. Longbehn, 950 F.2d 450, 451-452 (8th Cir. 1988). We view a shelter on Red Lake to be near akin.

6. The arrest after questioning**.**

That happened. She was not free to leave. Before Ms. Gillmore was ever approached, the Agent had already decided she never would be.

**B. The Second Interrogation**.

The delay in bringing Ms. Gillmore before Magistrate Burg in Bemidji was intentional and surely unnecessary. The Magistrate Judge erroneously found her appearance without fault. Report and Recommendation at pp. 25-26. Again we respectfully disagree.

We sympathize to a limited extent that the Magistrate there would want the hearing at the end of the day, thus avoiding conflict with his normal workaday life. But Rule 5(a), Fed. R.Crim.P., isn't written so that a lawyer in Bemidji cannot be bothered until a certain moment of convenience, a convenience the Magistrate

accepted without question. Report and Recommendation at p. 25.

The Rule requires the defendant's initial appearance to occur without "unnecessary delay." An unnecessary delay is determined in light of the facts and circumstances of each case, with the Court considering the amount of time passed and the reason therefore. Mallory v. United States, 354 U.S. 449, 455 (1957); see also United States v. Nazarenus, 983 F.2d 1480, 1482-83 (8th Cir. 1993); United States v. Pugh, 25 F.3d 669, 675 (8th Cir. 1994). Secondary factors include the location of the Magistrate Judge, and the transportation of the defendant. 18 U.S.C. 3501 (c). Federal involvement in Ms. Gillmore's arrest triggers the Rule 5 requirements. See United States v. Chevre, 146 F.3d 622, 624 (8th Cir. 1998).

The federal statute suggests six hours is reasonable. 18 U.S.C. 3501 (c). That period is measured from the time Ms. Gillmore is arrested to her initial appearance. United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994); United States v. Clarke, 110 F.3d 612, 615 (8th Cir. 1997). Our gap is twenty-four hours and too long.

Bemidji is thirty minutes from Red Lake. The Magistrate is in the same small town. There was no excuse to wait, and the delay was unreasonable, contrary to the Magistrate Judge's findings. Report and Recommendation at p. 27.

The appearance could have happened by the early morning. Instead, the

Agents took another run at a vulnerable defendant, who succumbed to their persistence, describing the murder to her everlasting prejudice.

Where, as here, a confession is secured as a result of an unnecessary delay of over six hours, suppression is the remedy, a remedy premised upon this Court's supervisory authority. See McNabb v. United States, 318 U.S. 332, 347 (1943) and Mallory, 354 U.S. at 455-56, both cases the Magistrate did not discuss.

Dated: August 14, 2005

/s/ Paul Engh
Paul Engh
Suite 215 220 South Sixth Street
Minneapolis, MN 55402
(612) 252-1100

Attorney for Ms. Gillmore