**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

Plaintiff,

v.

Carol Louise Gillmore,

Defendant.

Criminal No. 02-85(1) (DWF/RLE)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER FOR CONVICTION OF MURDER IN THE SECOND DEGREE, AND MEMORANDUM**

---

Clifford B. Wardlaw and David M. Genrich, Assistant United States Attorneys, United States Attorney's Office, counsel for Plaintiff.

Paul C. Engh, Esq., Engh Law Office, counsel for Defendant.

---

The above-entitled matter came on before the Honorable Donovan W. Frank, Judge of the above-named Court, as a trial before the Court, the parties having waived a jury trial, on January 31, February 1, 2, and 6, 2006.

The Superseding Indictment before the Court charges Defendant Carol Louise Gillmore ("the Defendant") in Count 1 with Felony Murder in the First Degree alleging that on or about February 13, 2002, Defendant, with malice aforethought, did unlawfully kill George A. Stately in the perpetration of a robbery, in violation of Title 18, United States Code, Sections 111(a), 1151 and 1153(a). Count 2 alleges Premeditated Murder in the First Degree alleging that on or about February 13, 2002, Defendant willfully, deliberately, maliciously, and with premeditation and malice aforethought, did kill George A. Stately by repeatedly striking him in the head with a hammer and cutting his throat with a knife, in

violation of Title 18, United States Code, Sections 111(a), 1151 and 1153(a). Count 3 alleges Intentional Second Degree Murder alleging that on or about February 13, 2002, Defendant did, with malice aforethought, kill George A. Stately by repeatedly striking him in the head with a hammer and cutting his throat with a knife, in violation of Title 18, United States Code, Sections 1111(a), 1151 and 1153(a). Count 4 alleges the offense of Arson, specifically, that on or about February 13, 2002, Defendant did willfully and maliciously set a fire to burn down the home of George A. Stately, in violation of Title 18, United States Code, Sections 81, 1151 and 1153(a).

The parties entered into an agreement that included waiving a jury trial in this matter. In that signed agreement, the Defendant admits the unlawful killing of George Stately. The Defendant further agreed that she makes no claim of justification, including making no claim of self-defense or intoxication. The parties agreed that the defense would raise the legal issue of imperfect self-defense. The parties, however, disagree about Defendant's level of culpability. At trial, the Defendant argued that she is guilty of manslaughter and the Government argued for a murder verdict.

Based upon the presentations of counsel, the testimony and exhibits received, and the Court being otherwise duly advised in the premises, the Court hereby makes the following:

## FINDINGS OF FACT

1. That in the morning hours of February 14, 2002, at approximately 8:00 a.m., the Red Lake Police Department ("RLPD") received a report from a citizen who advised that smoke was seen rising from the residence of George Stately, who was an enrolled member of the Red Lake Band of Chippewa Indians and who resided within the exterior boundaries of the Red Lake Indian Reservation.

2. That members of the Red Lake Fire Department responded first and found the home ablaze. After determining that George Stately had died and that he appeared to have been a victim of a crime, the firefighters exited the home after extinguishing the fire and securing the residence.

3. Deputy State Fire Marshal Ronald Rahman testified that the fire originated from at least two locations found at opposite ends of the house. Specifically, Rahman testified that fires were separately set at the centerpiece of the kitchen table and the southwest corner of the bedroom. Rahman also testified that the evidence indicated a third fire had been set in the living room, though noted the evidence was inconclusive. No evidence was found that an accelerant had been used.

The Court finds and concludes that the setting of two or three fires at different points of origin found at opposite ends of George Stately's home is consistent with deliberate and intentional conduct by the Defendant, and inconsistent with a pattern of frenzied and out-of-control behavior.

4. Elvira Morgan, a friend of the victim, George Stately, who had known him for 35 years, testified that on the evening of February 13, 2002, she telephoned George Stately at approximately 9:30 p.m., and while she was on the telephone with George Stately, she heard George Stately say, "Carol, what are you doing here?" George Stately then came back to the telephone according to Morgan. George Stately also told Morgan on a previous occasion that he had loaned the Defendant $30, with the agreement that the Defendant would pay him back $60.

5. Federal Bureau of Investigation ("FBI") Special Agent John P. Egelhof proceeded to the George Stately residence on the morning of February 14, 2002. Agent Egelhof and others observed a trail of blood stains leading from the back door to the middle of the back parking area where they observed a set of tire tracks, establishing that a motor vehicle had been parked in the back of the residence, backed up, spun its tires, and then left the yard. The agents found what appeared to be blood stains on the back door and screen door to the home. The interior of the house was heavily damaged from smoke and heat. A rear bedroom and the southwest portion of the home was heavily damaged by fire. A fire had also ignited on the kitchen table. George Stately's body was laying on the floor of the living room with a knife and hammer and a portion of a newspaper neatly placed on his body.

6. The Court finds, based upon the evidence before the Court, that the neat placement of the hammer, knife, and portion of a newspaper on George Stately's body, was consistent with intentional and deliberate conduct by the Defendant to set fire to the home

and destroy and/or damage the hammer and knife, with the assistance of the newspaper. This conduct, based upon the record before the Court, is contrary to any suggestion that the conduct of setting a knife, hammer, and newspaper on top of George Stately's body was frenzied behavior and inconsistent with the Defendant being in a dissociative state. Rather, it is circumstantially consistent with deliberate and intentional conduct by the Defendant.

7. Large amounts of blood splatter were observed on the walls, floor, and furniture near George Stately's body. Blood spatters were also found on the kitchen table. Several items of furniture in the living room were in disarray, consistent with a physical struggle having taken place.

8. Agent Egelhof observed numerous blows to George Stately's head.

9. Dr. Michael McGee, the Ramsey County Medical Examiner, performed an autopsy on George Stately. George Stately's blood alcohol level was .025, consistent with a man of his size and weight having consumed one to two beers, and inconsistent with a level or state of intoxication. Numerous incisions were observed on the hands of George Stately, consistent with defensive wounds commonly observed on assault victims. The cause of George Stately's death was assault with multiple injuries, although Dr. McGee testified that the slash wound to the neck would have been enough to kill George Stately on its own. There were 50 hammer blows to George Stately's neck and head area and 27 slash wounds to his neck area. Dr. McGee identified approximately 71 total separate injuries, which was a conservative number. Dr. McGee testified that a great deal of force was needed to inflict the amount of damage that the skull sustained.

10. Given the nature and extent of the wounds, the Defendant clearly used multiple weapons during the course of the assault.

11. On February 13 and 14, 2002, the Defendant was a resident at the Equay Wiigamig Women's Shelter ("the shelter") located a short distance away from George Stately's home. Agent Egelhof proceeded to the shelter in the late afternoon of February 14, 2002. Agent Egelhof interviewed the Defendant in the presence of an advocate named "Mrs. Parker."

The first response by the Defendant, upon being introduced to Agent Egelhof, was, "Are you here to discuss my suicide attempt?" At that time, the Defendant had already been to a hospital in Thief River Falls and had received an injection of an anti-anxiety drug. There was no mention of George Stately during the first interview.

12. The Defendant gave or told differing accounts of her whereabouts on the evening of February 13, 2002, to the FBI. During a second account, she told Agent Egelhof that she recalled leaving the shelter to visit her uncle, who was not home, but recalled stopping at "my friend George Stately's" because of a deflated low front tire, indicating to Agent Egelhof that George Stately was on the phone when she arrived and that George Stately came out of the house with a tire gauge to check her tire. During this account, the Defendant told the agent that she never went into George Stately's home. Defendant stated that she returned to the shelter around 9:20 p.m. or 9:30 p.m., the shelter curfew being 9:00 p.m. There were no visible injuries on the Defendant, except that she stated she had bumped her nose on the car steering wheel during her suicide attempt. She denied

borrowing money that evening from George Stately. When told of George Stately's death, the Defendant started to cry, but said, "I know nothing." When the agent noted the blood around the doorways of the shelter, the Defendant mentioned a bloody nose from the suicide attempt. At that time, she indicated that she had borrowed money from George Stately on previous occasions in which she would borrow $20 or $30 and agree to pay back $40 or $60.

13. The Court finds that the ability of the Defendant to note a bloody nose as the cause of blood located around the shelter in response to Agent Egelhof's observation that he had observed blood in the shelter is consistent with a deliberate, intentional, and controlled attempt to manipulate the facts and to deceive the agent. Such a response, under all of the circumstances as shown by the evidence, is inconsistent with the Defendant having been in a dissociative, frenzied, or panicked state at an earlier time while at George Stately's home.

14. At some point during the interview, the Defendant asserted that George Stately had made sexual advances toward her in the past, but not on February 13, 2002. However, in a later interview, the Defendant contradicted this statement. The Defendant told Agent Egelhof, "I went there to tell him I could not pay back any money until Friday." She then acknowledged to the agent that she went inside to get a drink of water after which George Stately propositioned her for sex by stating, "I know you are fucking my brother so why don't you give it up to me?" The Defendant denied that she physically struck back, at which time she stated that George Stately grabbed her breast and said, "Nobody hits me."

She went on to state to Agent Egelhof that she did not want to be raped, so she picked up the hammer. The Defendant said George Stately grabbed the hammer and hit her once. The Defendant then stated, "I got the hammer away and hit him." According to the Defendant, George Stately then went to get a knife and they began rolling around. George Stately then said, "I will kill you," at which point the Defendant told Agent Egelhof she remembered seeing red.

The Defendant admitted being addicted to crack cocaine and to having smoked crack cocaine on the morning of February 13th. The Defendant stated she obtained the crack cocaine from the Needham home, known on the reservation as a "crack house." When the FBI found George Stately's body, the zipper was down on the trousers he was wearing. Contrary to the position taken by the Defendant, the Court finds and concludes that it is entirely speculative as to what, if anything, that means and when it happened. The Court respectfully rejects the Defendant's contention that it is consistent with a sexual advance or attempted sexual assault. All evidence in the case, direct and circumstantial, points to the contrary.

15. Two days later, on February 15, 2002, at the Beltrami County Jail, the Defendant agreed to talk to Agent Egelhof again, at which time she stated that George Stately grabbed her first by pulling her hair and that she was trying to flee when she grabbed the hammer to protect herself.

The Defendant at all times denied taking anything from the house but volunteered, "I am losing my mind because of the rape in Bemidji." On cross-examination, Agent Egelhof

acknowledged that the Defendant had stated to him, "When he grabbed my breast, I freaked out. I did not want to be raped again so I fought for the hammer." "I hit him once with the hammer and went blank." "We were rolling around. George Stately said he was going to kill me." "I did not want to be attacked like that again." She again told Agent Egelhof that she went to fix her tire, not to obtain money.

16. Amy Boswell, the Defendant's aunt, testified. She confirmed that her sister, the Defendant's mother, had asked her to permit the Defendant to move from Kansas into her home on the Red Lake Indian Reservation. In July 2001, the Defendant moved into Boswell's home. The Court sadly observes that although Boswell testified that she was aware of the Defendant's chemical abuse problem, from July 2001 until Boswell demanded the Defendant leave her home, Boswell frequently drank alcohol with the Defendant to the point of intoxication. Boswell testified that she smelled marijuana, at times, on the Defendant. George Stately played pool at Boswell's home, along with the Defendant. Oftentimes the three drank alcohol together. Again, even though Boswell acknowledged that the Defendant's move to Red Lake was "a last ditch effort to get her life on track and a new start," the Court sadly observes that Boswell, George Stately, and others, willingly drank with the Defendant to the point of intoxication.

17. On February 14, blood stains were discovered on the mattress that the Defendant used at the women's shelter and on the door to the women's shelter. The Defendant clearly tried to clean up the blood and the mess at the shelter. The Defendant admits that she hid her shoes in the back of a clock in her room, which the Court finds is

inconsistent with the Defendant having at any time been in a dissociative state and consistent with a deliberate and intentional and, at times, controlled effort to conceal her conduct.

Moreover, Charlotte King testified at the trial that she found what turned out to be George Stately's wallet in the mattress of the bed where the Defendant was sleeping. Again, the Court finds this post-killing concealment is consistent with a deliberate, controlled intent to conceal, and inconsistent with someone who, in the heat of passion and while in a dissociative state, not only killed George Stately, but, without any memory, removed the wallet, regardless of when the wallet was removed or taken, namely before or after the killing of George Stately, proceeded to the shelter, and concealed the wallet.

18. On the evening of February 13, 2002, Darlene Jourdain, a shelter worker, testified that the Defendant, without displaying any emotion, stated, "I need to get the money I owe my uncle." The Defendant then left the shelter. She returned after 9:00 p.m., violating her curfew. Upon her return, Jourdain testified that "she walked by me on February 13th as fast as she could." Jourdain testified the Defendant was insistent on leaving the evening of February 13, notwithstanding that it was near curfew time.

19. The Court finds that the Defendant's insistence on leaving the shelter, as expressed to Jourdain, based upon the evidence before the Court, was not for the reasons stated by the Defendant, namely to talk with her uncle about paying money back to him. The Court rejects the Defendant's explanation for insisting on leaving the shelter as not credible. Rather, the evidence in the case and the conduct of the Defendant in insisting on

leaving, when viewed in the context of the pattern of her coming and going at the shelter from the time of her arrival in October 2001 is consistent with a person intending to obtain drugs in order to get high. The Court, therefore, finds that the Defendant left the shelter on the evening of February 13, 2001, in search of drugs so she could get high.

20. Marla Needham, a Red Lake resident, testified that the Defendant came to her house the evening of February 13, sometime between 9:00 p.m. and 11:00 p.m. Needham was identified in the trial as living in "a crack house on Red Lake." Needham testified that the Defendant asked to use her bathroom. Although unbeknownst to Needham, the Defendant went to Needham's home after killing George Stately. Needham described the Defendant as "shaky," "bloody," "having a bloody sleeve," and "talking weird."

21. Steve James Rainey and Conrad Lee Rainey testified that they were present at Needham's home when the Defendant arrived on February 13th. Steve James Rainey and Conrad Lee Rainey acknowledged, as did Needham, that the Defendant asked for money and crack cocaine, neither of which she obtained at Needham's home, at least on that evening.

22. According to the record at the shelter, the Defendant moved into the shelter on or about October 21, 2001. Until that time, the Defendant stated she had been living in the basement of her aunt's home. The Defendant stated that her aunt kicked her out of the home, however, after accusing the Defendant of having sex with the aunt's ex-husband. The Defendant contended that her aunt tried to assault her in connection with the accusation.

During her intake interview, according to the records, the Defendant stated she was raped in Kansas in approximately July 2001.

Sadly, the record shows curfew violations of the Defendant coming and going, including not returning during the evening hours at times. For instance, on November 18, 2001, the shelter records note that the Defendant had been coming and going "frequently" and that she must be very busy.

23. The shelter provided psychological services via psychologist Lora J. Bertelsen, Ph.D. Dr. Bertelsen's notes are significant for many reasons, so the Court will quote from them in some detail.

On February 7, 2002, Dr. Bertelsen had contact with the Defendant at the shelter. The Defendant reported that she was raped in Kansas, moved to Red Lake, and then found out she was pregnant. She stated she received an abortion, something she now regrets. She stated that at that time, on February 7, 2002, she just wanted to sleep and avoid people. She reported experiencing panic attacks–approximately four per day. She also reported agoraphobia, which, according to Dr. Bertelsen, appeared to be increasing. She was troubled by violent nightmares.

The Defendant admitted that she had been treated for alcohol, cocaine, and marijuana addictions. She reported to Dr. Bertelsen, however, that she had not used any alcohol or drugs since before Christmas. The Court finds that the Defendant's statement of no alcohol or drug use since before Christmas was not a credible or true statement. The Defendant has since acknowledged that she was using alcohol, cocaine, and marijuana during that time. On February 8, 2002, Dr. Bertelsen visited again with the Defendant. The Defendant was tearful during this time, unable to work, and needed a doctor's excuse. Dr. Bertelsen

assisted in obtaining a prescription for her anxiety that was going to be prescribed and given out by employees of the shelter. Dr. Bertelsen also provided the Defendant with reading materials about abortion.

Significantly, on the morning of February 13, 2002, Dr. Bertelsen visited with the Defendant at the shelter. The Defendant was tearful throughout their session. She told the doctor she was "a worthless person" due to the abortion and her inability to pull herself out of her current emotional state. She did express suicidal feelings to Dr. Bertelsen, but stated she would not attempt it because of her two sons. She promised that she would get an advocate for help if she felt she could not control her urge to hurt herself. She reported to Dr. Bertelsen that she had not slept nor eaten the last two days. She expressed fears of "being hurt again" and seeing shadows passing by her windows at night.

Dr. Bertelsen observed in the shelter notes of February 13, 2002, that the Defendant’s guilt over the abortion will take time to work through.

Dr. Bertelsen also observed that anxiety-panic may be a delayed onset of post-traumatic stress syndrome related to the rape in Texas.

Dr. Bertelsen also testified at trial. She observed that the Defendant was in extreme agony and distress on February 8, 2002, and that the Defendant was agitated and distressed over the abortion, as well as extremely anxious. Dr. Bertelsen stated she was worse on February 13, 2002, stating she was "painfully anxious and agitated." Dr. Bertelsen observed that the Defendant continually expressed the abortion as a primary source of trauma and anxiety.

The Court must observe and so finds that the only positive aspect of much of the testimony the Court heard was the true support that the advocates at the shelter provided to the Defendant and how it was received by the Defendant. The shelter personnel are some of the only people, based upon the evidence before the Court, that did not take advantage of the Defendant and who did the best they could to help her in every way. Such cannot be said about most of the other individuals who encountered the Defendant from the beginning of her stay in October 2001 until the tragic events of February 13, 2002.

24. The Defendant admitted smoking crack cocaine on the morning of February 13, 2002. Neither the Government nor the Defendant assert that she was under the influence of crack cocaine at the time George Stately was killed. However, no blood or urine tests were given to the Defendant to verify whether there were drugs present in the Defendant.

Nonetheless, the desperate need to smoke crack cocaine, in the context of the evidence in the case, including the observations of Dr. Bertelsen, is consistent with the Defendant going to George Stately's home on February 13, 2002, to obtain money to purchase additional drugs. Moreover, the Defendant's chemical dependency, addiction history, and history of mental illness, along with the other evidence before the Court, further compel such a finding. The evidence is also consistent, and the Court so finds, that the Defendant, for whatever reason, when George Stately declined to loan her money, flew into a fit of anger and rage, falling well short of being in the heat of passion or in any type

of dissociative state, killed George Stately and then attempted to conceal the evidence, which explains the fires.

25. On February 15, 2002, two days after the Defendant had killed George Stately, the Defendant gave a brief history to Agent Egelhof, substantially consistent with the medical records in the case, that included a rape in Pilot Point, Texas; a rape in Kansas in July 2001 which was followed by an abortion; and a rape in Bemidji, only to the extent that the Defendant remembers waking up and deducting that an unknown individual had engaged in sexual relations with her due to the physical state in which she found herself.

26. During the same conversation, the Defendant volunteered to Agent Egelhof that, "I am losing my mind because of the rape in Bemidji." While the Court accepts the testimony with respect to the rape in Texas and the rape in Kansas that resulted in an abortion, the Court does not find credible the Defendant's statement with respect to the most recent alleged rape in Bemidji. While it is true that the Defendant was vulnerable in all of these situations because of her mental and emotional state, her history of mental illness, and her drug and alcohol addiction, unlike the prior rapes, the rape in Bemidji described in the medical records from November 6, 2001, is "Patient here stated she woke up in motel in Bemidji at 3:00 a.m.,.does not remember what happened," "possible alleged sexual assault." The medical records also state that the Defendant's clothes were off when she woke up. Emergency Room notes state that there was no evidence of trauma to external genitalia, and that "[t]he patient was concerned with pregnancy."

27. Without concluding whether George Stately and the Defendant, prior to the events of February 13, 2002, had a physical or sexual relationship, the Court rejects the position of the Defendant that she was attacked by or approached by George Stately for sex on February 13, 2002. The Court finds and concludes that if anything triggered the behavior of the Defendant, it was not fear of sexual relations, rape, or abortion, but rather an intense urge and need to obtain money and drugs to get high. Defendant's desire for drugs is consistent with the Defendant's pattern of coming and going at the shelter and her compelling need to leave the shelter near curfew time on the evening of February 13, 2002. The Defendant had gotten high in the morning on crack cocaine and that was the sole focus of her conduct on the evening of February 13, 2002.

The Court's rejection of the Defendant's version of the events of February 13, 2002, is not to minimize her sad and chronic history of mental illness and chemical dependency. The Defendant testified at trial that she was "nothing without my medication." The Court does not take issue with this view by the Defendant.

28. The Defendant was repeatedly molested when she was four years old by a babysitter. The Court finds this testimony credible and consistent with the medical records the Court has reviewed. The Defendant did not tell her mother about the sexual molestation until she was in her thirties.

29. As a freshman at the University of Kansas, the Defendant became pregnant. This event was extremely traumatic to the Defendant and precipitated, in many ways, the depression that has plagued the Defendant since that time. At that time, she was pressured,

from her point of view, to get an abortion. The Defendant declined to have an abortion because she "knew" she would go to hell because she is Catholic. She delivered the baby and suffered postpartum depression afterwards.

She recalls being hospitalized for psychiatric reasons on eight to ten occasions with approximately seven to eight suicide attempts. She had a second son, Casey, in approximately 1992, with her then husband, Gary Gillmore in Lawrence, Kansas. She was divorced from Mr. Gillmore in 1994.

The Defendant testified that her two sons are her only source of happiness on earth. She in fact said that if anything happens to either one of them, she will kill herself.

30. The Defendant admits she has used crack or drugs to self-medicate.

31. She testified she was raped in July 2001 after meeting a man in a bar. As a result of that rape, the Defendant became pregnant and had an abortion in October 2001, which the Court finds is the primary cause of her mental/emotional distress at this time. The Defendant, and the Court states very sadly so, testified, "I will go to hell. I am a Catholic. I am a murderer. God has punished me for the abortion that I had," and "I can’t live with the abortion."

32. The Defendant testified at trial that she drank all the time with her aunt at Red Lake. Sadly, the evidence in the case confirms this fact.

33. The Court finds that parts of the Defendant’s testimony about the victim, George Stately, were accurate and consistent with the evidence. The Defendant stated that George Stately was always friendly and always nice to her. She did say, as others did, that

she would borrow $30 from George Stately at the beginning of the week and pay back $60 at the end of the week. The Defendant stated that they would drink together and she would pay George Stately for rides. The Court finds that statement to be credible. The Court also finds that the Defendant, in fact, had no fear of George Stately and that, as she stated, he was a "nice old man."

**Medical Records**

34. The Court reviewed the medical records, approximately 2,000 pages in length, that were admitted into evidence. The Court highlights the salient portion of the medical records as follows:

| | |
|---|---|
| December 30, 2001 | 72-hour hold order. Placed by physician. Notation in the examiner's statement hold order states the reason for the hold, "Many past serious psychosocial trauma plus Recent significant life changes. Moving from Kansas and leaving her 2 children with x-husband after a July rape then October abortion. She is a Catholic who is feeling exhausted and suicidal–admits to this freely; pt was self medicating with alcohol & marijuana till 2 weeks ago. She works–80 hrs/week as a CNA @ a Nursing Home, and feels she is beyond redemption." The same records also indicate that her complaint upon entry is suicidal because she was raped on July 16, 2001, and had an abortion at Fargo, North Dakota, on October 13th. Has been depressed since last suicide attempt in February 2001. In addition, at discharge on December 31, 2001, "good stable." |
| January 9, 2002 | Spent 50 minutes at the Red Lake Public Health Service restarting Trazodone for major depression. Suffering from anxiety-depression. |

| | |
|---|---|
| January 11, 2002 | Red Lake Public Health Service. Refill medication. Diagnosis: Major depression recurring. |
| February 9, 2002 | Red Lake Public Health Service. Panic attacks. "Agoraphobia–can't leave shelter. One to two panic attacks a day." Situational problems, abortion and being raped. Can't get out of bed. Purpose of visit–panic attacks. "Follow-up with Lora–shelter psychologist–for comprehensive health" and obtain work excuse. |
| February 14, 2002 | 1:33 p.m. the nursing assessment has three categories upon admission: "Emergent," "Urgent," and "Non Emergent." The "Urgent" box was checked upon admission. The Defendant reported to the emergency room that she tried to commit suicide this A.M. by trying to run over head-on another vehicle. Diagnosis: psychiatric disorder, suicide attempt, overdose. She was placed on a 72-hour hold and admitted to Thief River Falls Hospital and transported there from Red Lake. Quotation marks in the record are "depressed," "agitated," "hallucinating." The box "confused" was not circled by any medical personnel. What is stated is, "tearful," "suicidal ideation," "noncommunicative." |

However, the Court finds that the Defendant's comings and goings at the shelter, based upon its review of the shelter's records, are inconsistent with the Defendant's statement on February 9, 2002, that she was not able to leave the shelter. The Court again observes that it has concluded that the Defendant was leaving the shelter on a regular basis and the purpose of leaving was to obtain drugs or money for drugs.

| | |
|---|---|
| November 15, 2001 | The "Urgent" category is checked by emergency room personnel at Red Lake Public Health Service at 4:45 a.m. Vomiting, nauseous and diarrhea. Disposition is stable. Diagnosis: Gastroenteritis–acute. |
| December 24, 2001 | The urgent category is checked by medical personnel at the Red Lake Public Health Service. Coughing problems, urine cloudy. "May be pregnant." Advil and cough syrup is given. Depression is noted with two suicide attempts. "Currently on meds." "Crying." "Left abusive relationship in which she was raped." "I want an abortion." Nurse told Carol Gillmore where she could get information about an abortion and told her to sign up for Medical Assistance. She then seemed to calm down. She noted no pelvic exam since the rape. |
| January 29, 2002 | Red Lake Public Health Service. The "Non-Emergency" box is checked out of the three categories. Severe cough: chest discomfort and fever. |

From the Court's point of view, this rape was different in kind, trauma, and effect on the Defendant than when the Defendant woke up in a hotel room at 3:00 a.m. in Bemidji with no memory of what had happened.

| | |
|---|---|
| September 17, 1987 | She is conflicted about being a mom with a baby with her desire to go out on a date. Frequent nightmares in which baby is damaged. She continues to struggle with depression. Diagnosis: Dysrythmic disorder (300.40) Axis II. Personality disorder. |
| December 10, 1987 | "Feeling much better. She has not heard any noises recently. Excited about engagement to boyfriend. Imipramine 50 mgs. increased to 75 |

| | |
|---|---|
| | mgs./day. Mellaril 25 mgs./day. More calm and enthusiastic than before." |
| February 25, 1988 | Carol Gillmore baby son was with her when she came in to the hospital. She is described as passive. Follows the advice of people around her. Boyfriend at the time was Toby. Mentions she was drinking from time to time. Notation on charge states, "I advised her in the strongest terms about her vulnerability regarding this behavior and her tendency to get dependent at it. She is not drinking much yet, but she is in danger of developing a dependency." Records go on to state that Carol Gillmore seemed interested, but minimized to an extent. |
| June 17, 1988 | Hospitalized for depression. "Suicidal thoughts-gestures." |
| June 30, 1988 | Records indicate a history of depression, auditory and visual hallucinations. |

35. The Court observes that these records establish that the Defendant was experiencing nightmares prior to the July 2001 rape and the October 2001 abortion.

| | |
|---|---|
| September 19, 1986 | Very upset with pregnancy. "Parents do not know." |
| November 21,1986 | Ongoing family difficulties. |
| December 5, 1986 | Quite childish and infantile. Major depressive order. Mixed personality disorder. Borderline histrionic. |
| February 27, 1987 | Mother concerned with immaturity of her daughter. Histrionic personality features. Dysrythmic disorder. Seven months pregnant. Doctor observes that Carol Gillmore is a bit unrealistic about life with a baby. Ongoing |

| | |
|---|---|
| | conflict with mother noted. Working with Catholic Social Services. |
| April 10, 1987 | Michael expressing a few doubts about paternity. |
| May 1, 1987 | Met with Carol and her boyfriend Mike Lawry. Baby due in two weeks. |
| June 25, 1987 | Improvement. Fewer hallucinations. Conflict with mom because Carol wants more time for herself. Her mom says she should stay with the baby. |
| August 7, 1987 | Family interview with parents. Things going well. Some concerns regarding demand for visitation to biological father. Not presently taking medication. |
| August 20, 1987 | Came to her therapy session without her baby, no meds, and doing better. |
| September 30, 1987 | Brought her son along. "Again she exhibited a genuine warmth and concern for the child." Her parents did not want the father of the child to go near the house. |
| July 8, 1988 | Drinking problem. Doctor's advice: Do not drink. It is dangerous to you. Carol Gillmore's response: "I do not believe you. My friend says it's no problem and it isn't dangerous." |
| August 5, 1988 | 150 mgs. Imipramine, 25 mgs. Mellaril. |
| September 18, 1990 | Alcohol/drug counseling. Discussed disease concept of alcoholism with Carol Gillmore. |
| December 10, 1993 | Extreme mood swings. |
| December 17, 1993 | Discussing ways to deal with anger. |
| February 14, 1994 | Not getting mad as often with husband. |

| | |
|---|---|
| August 22, 1995 | Alcohol/drug counseling. AA with group counseling. Remain sober. |
| October 11, 1995 | Alcohol and drug counseling with AA and group counseling. "Remain sober." |
| February 16, 1996 | "Tell her to go to AA." Needs group support. Alcohol/drug counseling. AA philosophy spirituality. |
| April 25, 1996 | Stay sober. AA/NA with counseling. Alcohol/drug awareness counseling plan. |
| September 25, 1996 | Alcohol/drug counseling. DSM 4-305 alcohol abuse recommendation. "Stay sober with AA/NA and individual counseling." |
| 1999 | Cocaine and alcohol dependence. |
| December 9, 1999 | Drug: Zoloft and Trazadone. Depression. Straight A student as high school student. Pregnancy as a college freshman and wanted to kill herself. |
| September 27, 2000 | Another hospital admit. Major depression: cocaine overdose. Substance abuse. Overdosed on cocaine with intent to harm herself. Financial problems. Suspended driver's license for three years, DUI, and lots of debt. Ex-spouse physically abusive to her. Smoked crack with intent to OD for several months. "Trapped in substance abuse."<br><br>Yet, the Court observes that under injury risk assessment of "low," "medium," or "high," "low" is denoted. |
| October 18, 2000 | Dr. Elias Chediak. History of depression, substance abuse, alcohol, and cocaine. Carol Gillmore mentions childhood sexual abuse |

| | |
|---|---|
| | during this stay in the hospital. 72-hour hold. Is discharged on October 23, 2000. |
| October 22, 2000 | Notes problems with bad dreams while in hospital. |
| January 8, 2001 | Admitted to Rolling Hills Hospital in Ada, Oklahoma. Discharged on January 15, 2001, by Dr. Everett Baine. Is taking Risperdal, Ativan, and Paxil. History of substance abuse noted, including alcohol, marijuana, and crack cocaine. Acknowledges has been smoking marijuana for many years and crack for three months. She denies delusions and hallucinations. |
| October 21, 2001 | Red Lake Shelter records. "Aunt tried to fight me over jealousy. |
| November 19, 2001 | Curfew violation. Out all night. |
| November 20, 2001 | Drinking at Gus Bailey's house. |
| December 20, 2001 | 2:30 p.m. by Defendant to shelter advocate. "I do not want to live anymore. I am a bad person for leaving my children and for having an abortion–alcohol, drugs to self-medicate and crack cocaine. Molested at the age of four. Husband beat her. Raped and beaten. Scars on her face. |
| December 30, 2001 | Shelter records continued. Transported to Thief River Falls Hospital. Carol Gillmore explained of her first suicide attempt when she was got pregnant at 18 years old and in the first year of a four-year scholarship at the University of Kansas. Her parents were angry at her and ordered her to get an abortion. She said no and took 40 sleeping pills along with her Dad's heart medication. |

| | |
|---|---|
| | I was going to kill myself today in the woods with OD except car would not start. I was molested as a child and never dealt with it. |
| | Rape July 16; abortion October 30. |
| December 30, 2001 | Dr. Rittenour. Threatening suicide with OD of sleeping pills. History of overdosing. "Tearful, overwhelmed upon admission." Major precipitating event: rape in July and abortion in October. "This is in direct conflict with her religion." "Overwhelming guilt and remorse." As a result of hospitalization and upon discharge on January 5, 2002, "calm and in control, a lot better." PTSD major depressive disorder poly substance dependence, rape, abortion, and being away from her boys. Admission on December 30, 2001, and discharge on January 5, 2002. |
| | Shelter records. "I was staying at Gus Bailey's. I walked home after work, he was laying in blood. He was swinging a broom and hit me in the head with it–mad because I was leaving the next morning. He had been drinking for days." He made sexual advances. |
| December 30, 2001 | Admission date at Northwest Medical Center, Thief River Falls. Physician Rittenour. Staff clinical psychologist Ellie Wiemerslage. |
| | Carol Gillmore admitted attempting suicide by taking "a bunch of sleeping pills." She also has a history of overdosing on medications. She was tearful and overwhelmed during her admission. She was able to talk about the major precipitating event as being a recent rape. Subsequent to the rape, she found out she was pregnant and she had an abortion. This is in direct conflict with her religious beliefs and she felt overwhelming guilt and remorse. She reported that she has not slept in approximately three days and has not been eating or sleeping well prior to her admission. |

She has two pre-adolescent boys, both of whom are with their father in another state. She struggled to find meaning in the recent decisions regarding her rape and subsequent abortion, and choosing to let her sons stay with their father. She participated in full programming and was active in completing journaling assignments given to her. She demonstrated significant post-traumatic stress disorder, generalized anxiety, and depressive symptoms. She enthusiastically consumed all of the patient education material on these and similar disorders saying she found much that resonated with her life. As a result of her hospitalization, Carol was feeling calm and in control. By January 5th, she felt "a lot better" and was able to contract for safety. She will call and arrange an out-patient therapy appointment on Monday, January 7, and will see her regular medical doctor to monitor her medications. Transportation was arranged via Red Lake back to the women's shelter and she was discharged on January 5, 2002. Discharge diagnosis: DSM4 Axis I: Post-traumatic stress disorder. Major depressive disorder: recurrent. Polysubstance dependence for history. Axis II: Deferred. Axis III: See medical charting. Axis IV: Psychosocial stressors: Recent rape, recent abortion as a result of the rape, relocation, stress of being away from her two children. Axis V: GAF at discharge: 45.

| | |
|---|---|
| January 3, 2002 | Thief River Falls Northwest Medical Center records. Uses no contraception. Meeting with a priest to discuss abortion and other choices she made in context of her faith. Nightmares, sees people being skinned. Looking forward to moving to bigger place. Feels she has good support from the advocates at the shelter. |
| January 21, 2002 | Curfew violations. Did not return to the shelter yesterday or last night. |

| | |
|---|---|
| February 10, 2002 | Shelter records. Older son lives with the Defendant's mother. Born when the Defendant was 18 and a freshman in college. My younger son was a product of a four-year marriage that ended in 1994. Younger son with father and step-mother. Extensive psychiatric history from 1979 to the present, including Kansas, Oklahoma, and Minnesota. |

**Expert Testimony - William B. Orr, Ph.D., M.D.**

36. Dr. Orr testified that the Defendant suffers from Post-Traumatic Stress Disorder ("PTSD") that is directly related to the July 2001 rape and physical assault. Interestingly, while the Defendant has steadfastly attributed her PTSD symptoms to the abortion, it is Dr. Orr's and Dr. Bertelsen's opinions that the rape and physical assault in Texas were more likely the primary cause of the Defendant's PTSD.

The Court finds that the July 2001 rape and physical assault and subsequent abortion in October 2001, as well as the sexual abuse at the age of four, cumulatively and primarily caused her PTSD. However, Dr. Orr was unable to say to a degree of reasonable medical certainty whether the Defendant lacked the capacity to appreciate the nature and quality of the wrongfulness of her acts at the time she killed George Stately.

The Court finds and concludes that there is insufficient foundation in the record to establish that the Defendant was in a dissociative state at the time of the killing. However, even if the Defendant was in a dissociative state as that term was defined by the expert testimony, there is insufficient foundation in the record to establish that when an individual is in a dissociative state it impairs the logic and ability to form intent, perception, or

otherwise alters their state of awareness. Interestingly, Dr. Orr acknowledged that the Defendant did not suffer from any lack of capacity immediately prior to the killing or afterwards when she attempted to set the fire to the home, wash out the blood from her clothes, and conceal what had happened from the authorities by lying about not seeing George Stately.

37. The Court observes that it is noteworthy, as acknowledged by Dr. Orr, that the Defendant had used cocaine earlier in the day at a time when she was taking prescription sedative-hypnotic Lorazepam, which can contribute to poor judgment and impulsivity.

A factor that Dr. Orr did not take into account, nor did any of the other experts, is the circumstance, as the Court has already found above, that the Defendant's primary goal in going to George Stately's home was to obtain money for drugs, consistent with why she left the shelter at the time that she did.

**Expert Testimony - Lora Bertelsen, Ph.D.**

38. The Defendant told Dr. Bertelsen on February 13, 2002, at the shelter that "I am not currently using drugs." Even though the Defendant was in extreme agony and distress, the Court finds that was not a truthful statement. Dr. Bertelsen noted on February 8, 2002, that the Defendant was distressed over the abortion and was "painfully anxious, agitated." Dr. Bertelsen testified that the Defendant was worse on February 13, 2002.

**Expert Testimony - Patricia Frazier, Ph.D.**

39. Dr. Frazier testified that the Defendant denoted the abortion as the primary source of her PTSD. The Court agrees. Also significant to Dr. Frazier was the child sexual abuse at the age of four. The Court also agrees with that assessment. The Defendant's distress resulting from her abortion is corroborated in her medical records prior to the events of February 13, 2002.

**Expert Testimony - Robert A. Greg, Ph.D.**

40. Dr. Robert A. Greg testified for the United States.

41. That any Conclusion of Law which can be deemed a Finding of Fact is incorporated herein as such.

Based upon the above Findings of Fact, the Court now makes its:

## CONCLUSIONS OF LAW

1. Based upon the findings of fact above and the Court's evaluation of the evidence and all of the circumstantial inferences therefrom, the Court concludes that George A. Stately was not killed during the commission of a robbery on February 13, 2002. The Defendant is therefore not guilty of Felony Murder in the First Degree as set forth in Count 1 pursuant to Title 18 United States Code, Sections 1111(a), 1151 and 1153(a).

2. Based upon the findings of fact above and the Court's evaluation of the evidence and all of the circumstantial inferences therefrom, the Court concludes that while the Defendant killed George A. Stately, the killing was not with premeditation. The

Defendant is therefore not guilty of Count 2, Premeditated First Degree Murder, pursuant to Title 18, United States Code, Sections 111(a), 1151 and 1153(a).

3. Based upon the findings of fact above and the Court's evaluation of the evidence and all of the circumstantial inferences therefrom, the Court concludes that the United States has proven, by proof beyond a reasonable doubt, that the Defendant is guilty of Intentional Second Degree Murder, as set forth in Count 3, pursuant to Title 18, United States Code, Sections 1111(a), 1151 and 1153(a).

Specifically, the Court finds and concludes that the Defendant killed George A. Stately with malice aforethought. That is to say that the United States has proven, by proof beyond a reasonable doubt, that the Defendant, at the time of the killing, had the intent to willfully take the life of George A. Stately or had the intent to willfully act in callous and wanton disregard to the consequences of her actions upon the life of George A. Stately.

4. The Court finds and concludes that the Defendant did not act in the heat of passion caused by any provocation, circumstance, or so-called triggering event. The Defendant was not provoked in a way that would cause a person in her circumstance and with her diagnosis to lose self-control and enter into some kind of altered or dissociative state. The Court finds and concludes that the Defendant did not have an honest belief that she was about to suffer death or great bodily harm.

There was no provocation or triggering event except for the need of the Defendant to obtain money by way of a loan or other device to buy drugs in order to get high.

5. The Court finds and concludes that the Defendant killed George A. Stately in Indian Country.

6. The Court finds and concludes that the Defendant is Indian.

7. Based upon the findings of fact above and the Court's evaluation of the evidence and all of the circumstantial inferences therefrom, the Court concludes that the United States has proven, by proof beyond a reasonable doubt, Arson, as set forth in Count 4. Specifically, that the Defendant set fire to the home of George A. Stately and, in setting the fire, the Defendant acted willfully and maliciously. The home of George A. Stately was within Indian Country. The Defendant is Indian.

8. That any Finding of Fact which is deemed a Conclusion of Law is incorporated herein as such.

Based upon the above Findings of Fact and Conclusions of Law, this Court enters the following:

**ORDER**

1. That pursuant to the above findings of fact and conclusions of law, the Court hereby finds the Defendant guilty of Count 3 of the Superseding Indictment, namely Intentional Second Degree Murder, pursuant to Title 18, United States Code, Sections 1111(a), 1151 and 1153(a) and guilty of Arson as set forth in Count 4 of the Superseding Indictment, pursuant to Title 18, United States Code, Section 81, 1151 and 1153(a).

2. Accordingly, the Court respectfully directs the Clerk of Court to enter convictions consistent with the findings and conclusions of this Court.

3. The Court further respectfully directs that the United States Probation Office prepare a presentence report pursuant to the guilty verdicts of this Court.

Dated: March 17, 2006

s/Donovan W. Frank
DONOVAN W. FRANK
Judge of United States District Court

## MEMORANDUM

The Court has concluded that George Stately was brutally murdered on February 13, 2002, by the Defendant. A very serious case. A very sad case. A very avoidable tragedy.

This is a serious case because a decent man who befriended the Defendant, loaned money to the Defendant, and, yes, drank with the Defendant, was brutally killed because, in the Court's view, he declined to give additional monies to the Defendant so that she could obtain more crack cocaine or other drugs. That is why the crimes occurred on February 13, 2002, based upon the Court's evaluation of the evidence as set forth in the findings of fact and conclusions of law.

This is a sad case, not only because George Stately was killed for the reasons stated by the Court, but because the Defendant, a woman with a chronic history of mental illness, chemical dependency, and addiction, was not discouraged by anyone in her presence–be they friend or foe, relative or nonrelative–to do anything other than drink, use drugs, and continue on with the lifestyle she had often known prior to coming to Red Lake. This was supposed to be a new beginning for the Defendant–her last chance to start over, according to her mother. The Defendant had recently completed chemical dependency treatment for

at least the second or third time and was struggling with post-traumatic stress and depression.

Nonetheless, and quite sadly so, a number of individuals that were spending time with the Defendant and were around the Defendant knew full well that when the Defendant used alcohol and drugs, it was akin to pouring gasoline on a fire. The Court assumes that the Defendant's mother's expected that her sister would communicate such things to the people around her daughter. A background in psychology or social work was not needed to observe the significant distress that the Defendant lived with each day. Yet there was a notable absence, in the Court's view, of any type of disapproval or discouragement by those around her to the lifestyle she quickly returned to at Red Lake. Such acquiescence clearly aggravated the Defendant's mental health and chemical dependency problems. While the Court feels compelled to make these observations, as the Court's decision clearly states, this knowledge and acquiescence of the Defendant's situation by the people around her did not justify in any way or legally excuse in any way what the Defendant did on February 13, 2002. It does, though, explain, in substantial part, what happened and why.

The Court notes that the advocates at the Equay Wiigamig Women's Shelter provided the only positive influence on the Defendant during her stay at Red Lake. The shelter advocates provided the Defendant with unwavering love and support. In the Court's view, the advocates at the shelter did everything they could to give the Defendant a home, to support her, and to encourage her. The criminal justice system and communities like

Red Lake, all over the United States, owe their gratitude to such shelters and the advocates who work at such shelters.

The Court observed and carefully evaluated the Defendant during the course of the trial in this matter. The Defendant's suicide attempts, her depression, the loss and separation from her sons, the abortion, as well as the chemical dependency and drug addiction explain, in substantial part, the Defendant's emotional instability that this Court sadly observed during the trial.

**Imperfect Self-Defense**

The Court has, without reservation, respectfully rejected the Defendant's request for a manslaughter conviction, based upon what has been characterized as an imperfect self-defense. "Imperfect self-defense" refers to a situation in which an individual "honestly but unreasonably believes that he is in danger of injury or that killing is the only way to prevent it." LaFave and Scott, *Substantive Criminal Law*, § 15.3 at 514 (2003). As the findings make clear, the Court does not believe that the Defendant had an honest belief that she was in danger of death or great bodily harm whether or not she was in a purported dissociative state. As DSM-IV-TR states, "[t]he essential feature of Dissociative Disorders is a disruption in the usually integrated functions of consciousness, memory, identity, or perception. The disturbance may be sudden or gradual, transient or chronic. One of those disorders is Dissociative Amnesia which is characterized by the DSM-IV-TR as "an inability to recall important personal information, usually of a traumatic or stressful nature, that is

too extensive to be explained by ordinary forgetfulness." Such Dissociative Amnesia can occur in relationship to a Post-Traumatic Stress Disorder.

For the reasons set forth in the Court's findings and conclusions, the Court rejected the notion that George Stately provoked the Defendant or caused some type of triggering event that precipitated any type of dissociative state such that the Defendant had any type of honest belief that she was in danger of death or great bodily harm. However, even if the Court were to assume, for purposes of evaluating the Defendant's mental state, that she was in some type of dissociative state, there is no evidence in the record from any of the experts that the Defendant had impaired perceptions or that such impaired perceptions while in a dissociative state precipitated heat of passion as that term is understood under the law.

This is a sad and serious case about a woman with a chronic history of mental illness and drug and alcohol addiction who was leaving the shelter to obtain money, desperate to get high on crack cocaine. The Defendant was not in the heat of passion. The Defendant did not entertain an honest belief, whether it was reasonable or unreasonable, that she was in danger of death or great bodily harm. The Court has rejected that testimony and evidence in this case for the reasons stated. Consequently, even if the "imperfect self-defense" was recognized by the Eighth Circuit, the defense is not applicable to the tragic events of February 13, 2002.

It remains to be seen whether the issues the Court has raised are relevant to the sentencing.

**Conclusion**

The paramount issue that remains for this Court, and appropriately so, will be a fair and reasonable sentence. No one will seriously question that whatever the sentence may be that any federal correctional facility utilized by the Court and Bureau of Prisons will necessarily have to involve a facility that will meet the Defendant's mental health and chemical dependency needs.

As the findings and conclusions of this Court illustrate, whether the Court evaluates the Defendant in the context of a "dissociative state" or "a reasonably induced emotional disturbance or extreme emotional disturbance," the result is the same. While the Defendant was clearly suffering from a mental-emotional disturbance and is chemically dependent, the evidence before the Court establishes by proof beyond a reasonable doubt that the Defendant, with malice aforethought, as that term is defined under the law, killed George A. Stately, a human being in Indian Country, and is therefore guilty of second degree murder as set forth in Count 3 of the Superseding Indictment.

The time has come to proceed to sentencing and conclude the case in the interest of all parties.

D.W.F.