UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CR 02-85(RLE/DWF)

| | |
|---|---|
| United States of America, Plaintiff, vs. Carol Louise Gillmore, Defendant. | **DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS** |

* * * * * * * * * * * * * * * * *

The defendant, Carol Louise Gillmore, takes the following Position with Respect to Sentencing Factors.

1. According to the PSR, Ms. Gillmore's criminal history is II. The charge at issue – driving under the influence – would not likely have resulted in a six-month sentence here in Minnesota. Thus Ms. Gillmore's criminal history, while accurately rendered, may be over counted. This is a standard ground for departure, per Sec. 4A1.3. See, e.g. United States v. Shepard, WL 25881612, at p. 22 (8th Cir. Sept. 11, 2006); United States v. Smith, 450 F.3d 856, 862 (8th Cir. 2006).

2. The Guideline range, presumptively correct, should be 135-168 months.

3. The Defense opposes the Government's request for an upward departure for reasons of extreme cruelty. We dispute that there is evidence of prolonged suffering, one of the quintessential features of Sec. 5K2.8. See, e.g., United States

v. Little Hawk, 449 F.3d 837, 841 (8th Cir. 2006)(the defendant scalded a young child while she was alive, resulting in extensive burns); United States v. Iron Cloud, 312 F.3d 379, 381 (8th Cir. 2002)(defendant raped victim and then dragged her into a river and forced her underwater "thirteen to fifteen times").

The crime scene was one of frenzy. The Government infers cruelty by the chaos and blood, but the medical examiner conceded that an early wound – as opposed to the fiftieth – would cause Mr. Stately to die. Moreover, in cross examination, the medical examiner agreed with this text from Saukko and Knight, Knight's Forensic Pathology, 3rd Ed. (Arnold 2004):

> . . . A post-mortem injury to the head may bleed considerably if inflicted soon after death and these facts may sometimes cause confusion about the ante-mortem or post-mortem nature of the would, or about the length of time of survival following the injury. There is no reliable way of resolving this difficulty.

Id. at 176.

Our view is that the initial hammer blow could have killed Mr. Stately, and that the guideline doesn't address cruelty to the already dead.

4. Likewise, the defense opposes the Government's argument that a weapon was used, hence Sec. 5K2.6 permits enhancement. The Government cites United States v. Chase, (Slip Op. 05-2070 (8th Cir. July 3, 2006), a case which permitted an upward departure for a defendant convicted of voluntary manslaughter by use of a knife. What's important is that in Chase our Circuit

distinguished the natural difference between a manslaughter and a murder. "[A]lthough the applicable offense guideline did not take into account the use of a weapon or dangerous instrumentality, the use of a weapon to commit a second-degree murder was within the heartland of conduct encompassed by the offense guideline." Id. at 11 (citing United States v. Barber, 119 F.3d 276, 285 (4th Cir. 1997)(en banc)). The "fact that the end result of a defendant's conduct is murder necessarily implies that the instrumentality effectuating the death of the victim was dangerous in the manner it was used. Therefore, murder must subsume the use of a dangerous instrumentality." Id. at 11 (quoting United States v. Kelly, 1 F.3d 1137, 1142 (10th Cir. 1993)). Barber, Kelly and Crane hold Ms. Gillmore use of a hammer and knife is subsumed in the second degree murder guideline.

5. To the extent the Government continues to claim that Ms. Gillmore obstructed justice, per Sec. 3C1.1, we disagree. The fire itself cannot serve as an enhancement. Ms. Gillmore's arson and the fact that it served to "conceal the murder of George Stately" has already been taken into account. See PSR para. 35.

To hold that the fire obstructed justice would be to double count, which "occurs where 'one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.'" United States v. Reichow, 416

F.3d 802, 806 (8th Cir. 2005(quoting United States v. Hipenbecker, 115 F.3d 581, 583 (8th Cir. 1997)).

We note, too, that Ms. Gillmore confessed when confronted with the evidence of her guilt. Long before trial, she offered to plead guilty to manslaughter.

6. Ms. Gillmore's mental illness diminished her capacity to understand the nature of the crime. For that reason, the defense moves for a downward departure, in response to the Government's anticipated motions. Sec. 5K2.13 allows the Court to sentence at a lower range "if the defendant committed the offense while suffering from a significantly reduced mental capacity." There was un-rebutted testimony of Ms. Gillmore's post-traumatic stress diagnosis. Her etiology featured psychotic red outs.

Pre-Booker, diminished capacity was unavailable to the defendant convicted a violent crime. See, e.g., United States v. Dillard, 975 F.3d 12554, 1555 (8th Cir. 1992); United States v. Garlich, 951 F.2d 161, 163 (8th Cir. 1991). Now that the Guidelines are advisory, our view is that Ms. Gillmore's mental illness is in play for the purposes of lowering her sentence. See generally United States v. Lighthall, 389 F.3d 791,794 (8th Cir. 2004).

Even if the Court concludes Sec. 5K2.13 is still not applicable, 18 U.S.C. 3553 (a) allows for consideration of the "history and characteristics of the defendant." That Ms. Gillmore's mental illness may have caused a "red out" and a

resulting loss of memory is well documented in the literature and testimony presented. Photographs of the Stately suggested an unraveling, a dissociation typical of Ms. Gillmore's illness. Her conduct is significantly different from the defendant who is of sound mind and murders in cold blood.

. . . . . .

The end question has always been what period of time is appropriate. Ms. Gillmore is at the Court's mercy. We acknowledge that she has done a horrendous thing. She accepts the heartbreak and anger that will be expressed by Mr. Stately's family. The tragedy of a murder case is always that it didn't have to occur. Ms. Gillmore's on-the-stand tears were rooted in regret.

All of this leaves the question of what happens next. Whatever the term of imprisonment, Ms. Gillmore requests that she be sent back to Carswell FCI, where she has spent almost the last five years in a locked down mental health ward. She has benefitted from Bureau of Prison's custody. She receives weekly visits with the chief psychiatrist; her medications have been balanced.

The chant of more and more time has become the song of Congress. The <u>Booker</u> decision placed a check on this twenty year erosion of District Court sentencing discretion. What should be the end result here? We suggest fifteen years. Why.

In the end, Ms. Gillmore's sentence should match the crime

of conviction. It should mirror the law's imposition of order upon life's tragedies that inevitably occur. It should take into account the gradations of conduct. How the darkness of mental illness clouds perception.

All we ask is that the old practice – of using departure motions and enhancements to nullify a lesser verdict – be avoided.

Dated: September 22, 2006

Respectfully submitted,

S/ Paul Engh
PAUL ENGH
Suite 215, Pillsbury Center
220 South Sixth Street
Minneapolis, MN 55402
(612) 252-1100
Attorney Reg. No. 134685