UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No.: 02-85 (DWF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. CAROL LOUISE GILMORE, Defendant. | ) | **GOVERNMENT'S SENTENCING POSITION** |

The United States of America, by and through its attorneys Rachel K. Paulose, United States Attorney for the District of Minnesota, and Assistant United States Attorney David M. Genrich, respectfully submits the government's position with respect to sentencing in the above-captioned matter.

## I. FACTUAL BACKGROUND

The government recognizes that the Court is extraordinarily familiar with the facts underlying the offenses of conviction, namely Murder in the Second Degree and Arson. Nonetheless, because this matter has moved from the trial phase to the sentencing phase, the brutal and heinous nature of the offenses move from direct and circumstantial evidence of guilt to aggravating sentencing factors, and the impact of the offenses of the family of Mr. George Stately moves from the background squarely to the foreground. Accordingly, both are briefly reviewed below.[1]

---

[1] The factual summary is closely drawn from the Court's Findings of Facts and Conclusions of Law.

**A. The Murder of George Stately**

On February 13, 2002, defendant left a women's shelter on the Red Lake Indian Reservation in search of money and cocaine. She went first to George Stately's house, a "nice old man" who had loaned defendant money in the past. Mr. Stately was at home, talking on the phone to one of his many friends. Defendant asked for money, and Mr. Stately, either unable or unwilling or both, was not able to provide her with any. Defendant then killed him.

The murder was among the most brutal committed on the Red Lake Indian Reservation, or in this or any other jurisdiction. Mr. Stately fended for his life, with a crime scene that displayed earmarks of a struggle and numerous defensive cuts suffered by Mr. Stately on his hands in his attempts to fight off defendant. Defendant killed Mr. Stately through assault with multiple weapons, inflicting multiple injuries. Mr. Stately took 50 hammer blows to his head and neck. He took 27 slash wounds to his neck. He absorbed 71 or more separate injuries. Defendant attacked him repeatedly and with a great deal of force.

After these heinous acts, defendant took the victim's wallet and went about trying to destroy the crime scene, and the victim's body with it. Defendant set the murder weapons - hammer and knife - on top of the victim's body as it lay on the floor. Defendant then set fire to the victim's bedroom and, with the aid of a newspaper, attempted to burn the body as well.

Leaving the crime scene behind, defendant continued her search

for money and cocaine. Defendant drove to a house where crack cocaine was sold, and sought money and/or drugs. Receiving neither, defendant drove back to the shelter.

Defendant then consciously sought to hide evidence and obstruct justice. Among other acts, defendant hid her shoes in a clock, hid the victim's wallet in a mattress, and tried to "clean up" blood evidence. She lied repeatedly to the FBI, and ultimately arrived on an account of the murder that was not and is not credible.

**B. The Family of George Stately**

The government anticipates several family members addressing the Court at sentencing, including several of his children and at least one sibling. Family members have related to the government how difficult it has been to experience a trial in which the impact of the crime on family and community, which the government has explained is not relevant to guilt or innocence, has necessarily gone unheard. The family hopes to communicate as best they can the depth of their loss at the sentencing hearing.

## II. SENTENCING GUIDELINES CONSIDERATIONS[2]

**A. Obstruction of Justice**

Defendant attempted to obstruct justice in this case from the very moment she killed the victim. Defendant placed the murder weapons on the victim, and then attempted to burn the victim's

---

[2] Unless otherwise noted, all Guidelines references are to the 2001 Guidelines Manual, identified in the PSR as the Manual applicable to defendant's offense conduct.

body, which was then a critical part of the crime scene, with the use of paper and match. Defendant attempted to finish the job by also setting fire to Mr. Stately's home, hoping to destroy the entire crime scene and with it the compelling evidence of her brutal crimes.

Defendant then hid evidence in a clock and a mattress and tried to destroy blood evidence. Perhaps hoping that her attempts at destroying the crime scene had succeeded, she lied outright to the FBI before eventually settling on an account that was not credible or credited by the Court.

This is not a fraud case where documents were shredded before an investigation was even contemplated. The victim's home was instantly a murder scene that defendant willfully attempted to destroy in anticipation of a criminal investigation and possible prosecution. Defendant's efforts to conceal evidence persisted before, during, and after the interviews by the FBI; to cite just one example, the wallet, undisclosed by defendant and an important piece of evidence as to intent and motive, was not recovered from the mattress until long after defendant had been interviewed and taken into custody. Years after the offenses, defendant took the stand and provided testimony that, with respect to the events of February 13, 2002, was deemed not credible.

Defendant's obstructive conduct is properly accounted for as a two-level offense level increase under United States Sentencing

Guidelines ("U.S.S.G.") § 3C1.1;[3] as a factor that may be considered in arriving at a sentence, see U.S.S.G. § 3C1.1, Application Note 5; and as a factor under 18 U.S.C. § 3553 with respect, for example, to the nature and seriousness of the offense conduct.[4]

**B. Extreme Conduct**

Defendant's conduct was unquestionably, and unusually, heinous, cruel, brutal, and degrading to the victim. See U.S.S.G. § 5K2.8. The facts, as summarized above, identified in the Court's Findings of Fact and Conclusions of Law, and presented at trial, provide far more than the necessary preponderance of evidence required to make such a finding.

An upward departure in this case is fully consistent with the relevant case law. See, e.g., United States v. Larrabee, 436 F.3d 890, 891-94 (8th Cir. 2006)(affirming sentencing of defendant to 363 months, an upward departure from a range of 188-235 months,

---

[3] Given the breadth and depth of defendant's obstructive conduct, the increase is appropriate as encompassing conduct not found in the § 3C1.1 Application Notes' "non-exhaustive" examples; as committing perjury, see § 3C1.1 Application Note 4(b); as relating to the destruction, concealment, or attempted obstruction or concealment of an investigation, see § 3C1.1 Application Note 4(d); as providing material false statements, see § 3C1.1 Application Note 4(g); and as other conduct prohibited by obstruction of justice provisions under Title 18, see see § 3C1.1 Application Note 4(i) and, e.g., 18 U.S.C. § 1512(c)(1).

[4] Such treatment with respect to the arson component of defendant's obstructionist conduct is not barred by defendant's conviction for arson, which in any event did not result in any increase to the murder-driven offense level.

based in part on presence of extreme conduct in Murder in the Second Degree case); United States v. Loud Hawk, 245 F.3d 667, 669-70 (8th Cir. 2001)(affirming sentence of 60 years based on ten-level increase for extreme conduct in Murder in the Second Degree case); United States v. Grey Cloud, 90 F.3d 322, 322-23 (8th Cir. 1996)(affirming sentencing of defendant to life in prison, an upward departure from 188 to 235 months, based in part on presence of extreme conduct in Murder in the Second Degree case); see also United States v. Chase, 451 F.3d 474, 483 (8th Cir. 2006)(affirming departure for extreme conduct in voluntary manslaughter case).[5]

The facts and circumstances surrounding the offense conduct in this case fully justify application of the extreme conduct provision of the Guidelines. In comparison to the relevant authority, the victim's lack of provocation of a fight, the gratuitous infliction of injury upon the victim, and the post-assaultive actions of defendant are consistent with Larrabee, 436 F.3d at 893-94; the brutal and inhumane way defendant killed her victim and burned his body echoes Loud Hawk, 245 F.3d at 670; and defendant's heinous treatment of the victim during and after the killing make Grey Cloud instructive, 90 F.3d at 322-23.

Yet the fullest measure of defendant's conduct is to examine it in its totality. From the beginning of the attack through its

---

[5] Chase may not be distinguished as a "weapons" case, see Def. Sent. Position at 2-3. The Eighth Circuit relied in part on extreme conduct against the victim, separate and apart from defendant's use of a weapon, in affirming the upward departure. See Chase, 451 F.3d at 483.

aftermath, nothing but brutality was visited upon Mr. Stately, alive and dead. Under these circumstances, a substantial upward departure is justified.

The arguments of defendant do not counsel otherwise. For example, the notion that post-homicidal conduct cannot be considered, see Def.'s Sent. Position at 2 ("[T]he guideline doesn't address cruelty to the already dead"), has at least two flaws. First, it assumes that an initial, single wound caused Mr. Stately's death, a possibility that is neither supportable as a factual finding nor consistent with the evidence of struggle and defensive injuries suffered by the victim. Second, the Eighth Circuit in Loud Hawk (burning of victims' bodies) and Grey Cloud (dismemberment) affirmed consideration of post-mortem brutality on of the victim in application of the extreme conduct departure. See Loud Hawk, 245 F.3d at 670; Grey Cloud, 90 F.3d at 322-23;

**C. Criminal History**

Based upon the above, the government submits that defendant's criminal history category does not reflect the likelihood that defendant will commit other crimes. An upward departure is accordingly warranted pursuant to § 4A1.3.

**D. Defendant's Motion for a Downward Departure**

A downward departure, whether formally under § 5K2.13 or under the factors identified in 18 U.S.C. § 3553, is not appropriate in this case.

Defendant is not eligible for application of § 5K2.13. As a

factual matter, the Court has properly concluded that defendant did not suffer from a significantly reduced mental capacity at the time of the offense.[6] Moreover, the influence of defendant's drug abuse on the offense conduct and the need to protect the public, two exceptions to § 5K2.13, further render § 5K2.13 inapplicable. See U.S.S.G. § 5K2.13.

Nor do general § 3553 considerations support a downward departure. As the Court properly and fully recognized in its factual findings, the offense conduct int his case was motivated by money and drugs. Defendant did not suffer from diminished capacity as a factual or legal matter, and undertook a course of conduct that demonstrated willful acts from the onset of the attack, through the attempted destruction and concealment of evidence, and culminating in purposeful lying.

Defendant's mental health history received appropriately respectful treatment before and during trial, and in the Court's Factual Findings and Conclusions of Law. At the same time, however, at trial's end there was the fair and just determination that this brutal killing was deliberate, unprovoked, motivated by money and drugs, perpetrated with and followed by cold-blooded and calculating behavior, and committed with the requisite mens rea of malice aforethought.

---

[6] The more recent versions of Guidelines § 5K2.13 further explicate the necessary link between mental state and offense conduct for application of "diminished capacity." Compare U.S.S.G. § 5K2.13 (2005) with U.S.S.G. § 5K2.13 (2002).

Accordingly, it can now be said, and it has been adjudged with care and consideration, that this is not a case of diminished capacity. This is a case of extreme and willful violence, fueled by money and drugs, visited upon an "nice old man" who did nothing – nothing whatsoever – to provoke the attack. Under these circumstances, no downward departure, on any basis, is appropriate.

**E. Advisory Guidelines Range**

Based upon the government's positions outlined above, the government believes the appropriate advisory Guidelines range is 360 months to life. To the PSR's offense level of 33, the government would request a two-level increase for obstruction and, at minimum, a six-level increase for extreme conduct. With an adjusted offense level of at least 41 and a criminal history category of II, the advisory Guidelines range would be 360 months to life. With an offense level of 41, any increase to defendant's criminal history score with result in the same advisory range.

## III. SENTENCE RECOMMENDATION

In light of the above, and any additional arguments of counsel and other input received at sentencing, the government respectfully requests a sentence of no less than 480 months incarceration, and submits that a sentence of life in prison is amply supported by the record in this case construed in light of 18 U.S.C. § 3553. The government requests the sentence as a true measure of the crimes of conviction and the circumstances in which they occurred, and makes its request as a just sentence under § 3553 whether the request

falls within the advisory Guidelines range ultimately adopted by the Court or, alternatively, as an upward variance from the advisory range. The nature and seriousness of the instant offenses, promotion of the respect for law, just punishment for the murder and arson, considerations of deterrence and the protection of the public now and in the future, along with the other relevant § 3553 characteristics, all counsel strongly in favor of the recommended sentence. The government also notes that if this case were sentenced using the current Guidelines, the advisory Guidelines range, calculating using only the base offense level with no upward adjustments or departures, would be 262-327 months (base offense level 38; criminal history category II). See Larrabee, 436 F.3d at 894 (considering changes to base offense level for Murder in the Second Degree in reviewing reasonableness of upward variance under older Guidelines).

A sentence of 40 years to life, on the record before the Court in this case, is just, reasonable, and consistent with the facts and the law. The government respectfully requests that a sentence within that range be imposed.

Dated: September 27, 2006 Respectfully submitted,

RACHEL K. PAULOSE
United States Attorney

s/ David M. Genrich

BY: DAVID M. GENRICH
Assistant United States Attorney