# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 06-3545

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Carol Louise Gillmore, | * | |
| | * | |
| Appellant. | * | |

Submitted: June 13, 2007
Filed: August 15, 2007

Before MURPHY, BEAM, and SHEPHERD, Circuit Judges.

SHEPHERD, Circuit Judge.

Carol Louise Gillmore was convicted of second degree murder within Indian country, see 18 U.S.C. §§ 1111(a), 1151, and 1153(a), and arson within Indian country, see 18 U.S.C. §§ 81, 1151, and 1153(a). The district court[1] sentenced Gillmore to 396 months on the murder conviction, a concurrent term of 180 months for arson, and 5 years supervised release. Gillmore was also ordered to pay restitution

[1]The Honorable Donovan W. Frank, United District Judge for the District of Minnesota.

in the amount of $52,847.36. Gillmore's United States Sentencing Guidelines ("USSG" or "Guidelines") range for the murder conviction was 151 to 188 months. See United States Sentencing Commission, Guidelines Manual (Nov. 2001). Gillmore appeals her sentence for murder as unreasonable, and we affirm.

I.

In February 2002, Carol Gillmore, age 34, resided at a women's shelter on the Red Lake Indian Reservation in Minnesota. Gillmore suffers from Post-Traumatic Stress Disorder (PTSD) and depression arising from sexual abuse she endured as a child, multiple rapes, and undergoing an abortion. Gillmore also has a history of chemical dependency, and, at the time relevant to this case, she was addicted to crack cocaine. As a result of her addiction, Gillmore left the shelter on a regular basis to obtain drugs or money for drugs. While Gillmore resided at the shelter, she, on occasion, borrowed money from George Stately, an elderly man who lived on the Red Lake reservation, a short distance from the shelter.

On the morning of February 13, 2002, Gillmore smoked crack cocaine. That evening, Gillmore left the shelter in search of additional drugs and went to Stately's home to obtain money to purchase the drugs. When Stately declined to loan Gillmore money, Gillmore attacked and killed Stately. During the brutal attack, Gillmore, armed with a hammer and a knife, inflicted 50 hammer blows to Stately's neck and head and 27 slash wounds to his neck. Gillmore then placed the knife and hammer on top of Stately's body.

In an attempt to conceal the murder, Gillmore started at least two fires in Stately's home and left his body laying on the living room floor. In order to assist the burning of the body, Gillmore placed a portion of a newspaper on top of the corpse. Gillmore took Stately's wallet and went to a known "crack house" where she sought crack cocaine, although there was testimony that Gillmore was unable to obtain

cocaine at that time. Eventually, Gillmore returned to the shelter where she attempted to conceal evidence of her crime by cleaning up blood stains and hiding Stately's wallet in her mattress and her shoes in the back of a clock in her room.

In the morning hours of February 14, 2002, the Red Lake Fire Department responded to a report that smoke was coming from Stately's residence and found the home ablaze. Firefighters discovered Stately's body and observed large amounts of blood on the walls, floor, and furniture near Stately's body as well as on the kitchen table. Several pieces of furniture in the living room were in disarray, indicating that a physical struggle had taken place. Firefighters extinguished the fire and secured the residence.

Also, on the morning of February 14th, Gillmore reported to the emergency room at Thief River Falls Hospital, stating that she had attempted suicide that morning by trying to drive head-on into another vehicle. Gillmore received an anti-anxiety drug injection. Later that day, blood stains were discovered at the shelter, both on the door and on the mattress that Gillmore used. In addition, Stately's wallet was found in Gillmore's mattress.

In the late afternoon of February 14th, Federal Bureau of Investigation (FBI) Special Agent John Egelhof interviewed Gillmore. Gillmore asked Special Agent Egelhof if he was there to discuss her suicide attempt, and there was no mention of Stately during this interview. During a second interview with Special Agent Egelhof, Gillmore gave differing accounts of her whereabouts on the evening of February 13, 2002, both admitting and denying stopping at Stately's home. When Special Agent Egelhof noted the blood around the doorways of the shelter, Gillmore mentioned a bloody nose she sustained during her suicide attempt. Special Agent Egelhof informed Gillmore of Stately's death, and she began to cry but maintained that she was not aware of any relevant information. However, Gillmore stated that she had

borrowed money from Stately on previous occasions and that Stately had made sexual advances toward her prior to February 13, 2002.

Though Gillmore initially stated that Stately had not propositioned her on the evening of February 13th, she later claimed that Stately had done so and grabbed her breast. Gillmore stated that, because she did not want to be raped, she picked up a hammer to protect herself. However, Gillmore later claimed that Stately first procured the hammer and struck her once before she was able to get the hammer away from him. Gillmore went on to state that Stately attempted to pick up a knife, and they struggled. Gillmore alleged that, at some point, Stately said that he was going to kill her and that she "saw red."[2] Gillmore exhibited no visible injuries other than the injury to her nose sustained during her suicide attempt. Due to Gillmore's admissions, she was arrested and taken to the Red Lake jail.

On February 15, 2002, Gillmore was charged via compliant in the District of Minnesota with intentional second degree murder within Indian country, see 18 U.S.C. §§ 1111(a), 1151, and 1153(a), and one count of arson within Indian country, see 18 U.S.C. §§ 81, 1151, and 1153(a). Gillmore was taken to the Beltrami County Jail in Bemidji, Minnesota, for her first appearance on the complaint. There, Special Agent Egelhof again interviewed Gillmore, and Gillmore claimed that she went to Stately's house in order to fix her tire, not to obtain money. Gillmore also stated that Stately took hold of her and that she picked up the hammer to protect herself. On March 14, 2002, a grand jury returned a three count indictment, charging Gillmore with intentional second degree murder and arson, as well as one count of premeditated first degree murder, see 18 U.S.C. §§ 1111(a), 1151, and 1153(a). On February 3, 2004,

[2]Gillmore alleged at trial that her actions toward Stately were a result of her PTSD causing her to experience a "red-out," meaning that she entered into a dissociative state in which she suffered "a disruption . . . of consciousness, memory, identity and perception of [her] environment." See Diagnostic and Statistical Manual of Mental Disorders 477 (4th ed. 1994) (discussing dissociative disorders).

a grand jury returned a four count superceding indictment adding one count of felony murder in the first degree in perpetration of a robbery, see 18 U.S.C. §§ 1111(a), 1151, and 1153(a).

On January 31, 2006, a bench trial commenced before the district court. The bench trial followed Gillmore's waiver of her right to a jury trial, her admission to the unlawful killing of George Stately, and her waiver of any claim of justification, including self-defense or intoxication. However, Gillmore made a legal claim of imperfect self-defense, alleging that she had the right to defend herself against Stately's alleged sexual advances. Thus, Gillmore went to trial before the district court on the sole issue of her level of criminal culpability. The government sought a first degree murder verdict, and Gillmore contended that she was only guilty of manslaughter because, due to her mental illness, she overreacted to Stately's alleged sexual advances and acted in an unreasonable manner.

At trial, Dr. Michael McGee, the medical examiner who performed Stately's autopsy, testified that the cause of Stately's death was assault with multiple injuries, although Dr. McGee noted that the deep slash wound to Stately's neck would have been enough to kill him. Dr. McGee also pointed out that Stately's hands exhibited numerous cuts consistent with defense wounds commonly observed on assault victims. Dr. McGee stated that there were 50 hammer blows to George Stately's neck and head area and 27 slash wounds to his neck area. According to Dr. McGee, these 77 blows and wounds were a conservative estimate of the victim's total injuries. Dr. McGee further testified that a great deal of force was needed to inflict the amount of damage that the victim's skull sustained. Though Gillmore testified that she attacked Stately because he had made a sexual advance toward her and that, due to her history, she feared that Stately was going to rape her, she admitted that Stately was always friendly and nice to her and characterized him as a "nice old man." Four mental health professionals testified as to Gillmore's mental state and whether it impacted her

actions on February 13, 2002. The trial concluded on February 6, 2006, and the district court took the matter under advisement.

On March 17, 2006, the district court found Gillmore guilty of intentional second degree murder and arson. The court expressly rejected Gillmore's contention that she attacked Stately because he had made a sexual advance toward her, finding "all evidence to the contrary" and concluding "that if anything triggered the behavior of the Defendant, it was not fear of sexual relations, rape, or abortion, but rather an intense urge and need to obtain money and drugs to get high" and that this "was the sole focus of the Defendant's conduct on the evening of February 13, 2002."

In addition, the district court, having received the testimony of four mental health professionals and Gillmore's medical and mental health records as well as mental health experts' notes taken shortly before the attack, found that Gillmore was not provoked in any way that would cause a person in her circumstance to lose self-control, enter into an altered or dissociative state at the time of the killing, and engage in frenzied, out-of-control behavior. Furthermore, the district court found the facts supported a conclusion that Gillmore engaged in deliberate and intentional conduct, noting the arson, "the neat placement of the hammer, knife, and portion of a newspaper on George Stately's body" in order to assist in the burning of the body, the taking and concealing of Stately's wallet, and cleaning up blood at the shelter.

Following Gillmore's convictions, the United States Probation Office prepared a Presentence Investigation Report ("PSR"). With respect to the second degree murder conviction, the PSR calculated an offense level of 33, and the arson conviction produced an offense level of 26. Because the homicide carried the higher offense level, its level controlled as the top count for sentencing purposes. Gillmore had a criminal history category of II. Pursuant to the Guidelines in effect at the time of offense, Gillmore's sentence range for the murder conviction was 151 to 188 months.

On September 29, 2006, the district court conducted a sentencing hearing. Numerous members of Stately's family and friends provided victim-impact statements. Counsel for both parties supplemented written sentencing submissions with oral argument. The government recommended a sentence of at least 480 months based on obstruction of justice and extreme conduct coupled with a criminal history that the government contended underrepresented the likelihood that defendant would commit other crimes in the future. The government also noted that the Guidelines range for a second degree murder conviction committed under the Guidelines in effect at the time of sentencing would be 262 to 327 months, reflecting an upward revision to the base offense level for second degree murder from 33 to 38. See United States Sentencing Commission, Guidelines Manual, § 2A1.2 (Nov. 2006). Gillmore requested a sentence of 188 months, contending that no obstruction of justice enhancement was applicable and that her conduct was not extreme for sentencing purposes.

The district court accepted the PSR's calculation of Gillmore's Guidelines range, finding that it was 151 to 188 months, see 18 U.S.C. § 3553(a)(4)(A), and declined to apply any specific offense level enhancements, including obstruction of justice. The court recognized that the Guidelines in effect at the time of sentencing would have resulted in a much higher sentencing range and then proceeded to address the other relevant section 3553(a) factors at length.

The district court first considered "the nature and circumstances of the offense" and concluded that the unusually brutal nature of Gillmore's offense conduct, as evidenced by the severity of the 77 hammer blows and knife wounds sustained by the victim, presented a "serious set of circumstances . . . takes it outside the normal intentional murder case," necessitating a longer sentence than the Guidelines range. See 18 U.S.C. § 3553(a)(1). The court declined to determine which injury actually caused Stately's death, finding it irrelevant for sentencing purposes. With regard to "the history and characteristics of the defendant," the district court noted Gillmore's

history of sexual abuse, chemical dependency, and mental illness and found that these characteristics made Gillmore a danger to herself and the public, warranting a significantly longer sentence than the Guidelines range. See id. § 3553(a)(1), (a)(2)(C). The district court also stated that he considered the other section 3553 factors but specifically mentioned: (1) "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," see id. § 3553(a)(2)(A); (2) "the kinds of sentences available," see id. § 3553(a)(3); (3) pertinent policy statements, see id. § 3553(a)(5); and (4) "the need to avoid unwarranted sentence disparities among [similarly-situated] defendants," see id. § 3553(a)(6).

The district court sentenced Gillmore to 396 months imprisonment on the second degree murder conviction and 180 months on the arson conviction to be served concurrently, followed by 5 years supervised release. Gillmore was ordered to pay restitution in the amount of $52,847.36. Subsequently, the district court issued its written Statement of Reasons and, in addition to the section 3553(a) factors discussed at sentencing, the court cited the following bases for Gillmore's sentence: (1) Mental and Emotional Condition, USSG § 5H1.3; (2) Aggravating or Mitigating Circumstances, USSG § 5K2.0; and (3) Extreme Conduct, USSG § 5K2.8.

Gillmore appeals the district court's upward variance on the murder conviction, 208 months of additional incarceration or 110 percent, as unreasonable.

II.

Where, as here, neither party contests the district court's calculation of the Guidelines range, and Gillmore appeals only the variance from the Guidelines range, "the issue we examine on appeal is whether the sentence imposed is 'reasonable' in light of the factors articulated in 18 U.S.C. § 3553(a)." See United States v. Miller, 484 F.3d 964, 966 (8th Cir. 2007) (quoting United States v. Gonzalez-Alvarado, 477

F.3d 648, 650 (8th Cir. 2007)); see also 18 U.S.C. § 3553(c) (requiring a sentencing judge "at the time of sentencing" to "state in open court the reasons for its imposition of the particular sentence"); Rita v. United States, 551 U.S. ___, 127 S. Ct. 2456, 2468 (2007) ("Where the judge imposes a sentence outside the Guidelines, the judge will explain why he has done so.").

Though there is a presumption of reasonableness attributed to sentences imposed within the Guidelines range, there is no presumption that a non-Guidelines sentence is unreasonable. See Rita, 127 S. Ct. at 2466 ("A nonbinding appellate presumption that a Guidelines sentence is reasonable does not *require* the sentencing judge to impose that sentence. Still less does it *forbid* the sentencing judge from imposing a higher sentence than the Guidelines provide . . . ."); United States v. Gall, 446 F.3d 884, 889 (8th Cir. 2006), cert. granted, 127 S. Ct. 2933 (2007) (rejecting the notion that a presumption of unreasonableness applies to non-Guidelines sentences).

In reviewing Gillmore's sentence, "we must determine: (1) 'whether the district court's decision to grant a § 3553(a) variance from the appropriate [G]uidelines range is reasonable' and (2) 'whether the extent of any § 3553(a) variance . . . is reasonable.'" See Miller, 484 F.3d at 967 (quoting United States v. Mashek, 406 F.3d 1012, 1017 (8th Cir. 2005)). A district court imposes an unreasonable non-Guidelines sentence:

> if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper factor or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.

Id. at 966 (quoting Gall, 446 F.3d at 889).

Because Gillmore challenges the extent of the variance, "[t]he further the district court varies from the presumptively reasonable [G]uideline[s] range, the more compelling the justification based on the 3553(a) factors must be. An extraordinary reduction must be supported by extraordinary circumstances." Id. (quoting United States v. Bryant, 446 F.3d 1317, 1319 (8th Cir. 2006)). The sentence in this case is an upward variance that amounts to 208 months or approximately 110 percent above the top of the Guidelines range, which is the equivalent of a seven-level departure. Under this court's jurisprudence, this is "an extraordinary variance from the presumptive sentence range." See United States v. Meyer, 452 F.3d 998, 1001 (8th Cir. 2006) (finding a fifty percent increase from defendant's Guidelines range was an extraordinary variance); see also United States v. D'Andrea, 473 F.3d 859, 865 (8th Cir. 2007) (characterizing an almost 100 percent upward departure as an extraordinary); Gall, 446 F.3d at 889 (characterizing 100 percent downward variance as extraordinary). Thus, Gillmore's sentence must be "accompanied by extraordinary circumstances" in order to be reasonable. See Meyer, 452 F.3d at 1001.

III.

At the outset, "we . . . recognize that there is no numerical formula to determine whether a sentence is unreasonable and that significant deviations from [G]uidelines sentences have been affirmed post-Booker." United States v. Myers, 439 F.3d 415, 418 (8th Cir. 2006) (citing United States v. Rogers, 423 F.3d 823, 829-30 (8th Cir. 2005) (affirming a more than 500 percent upward variance)); see D'Andrea, 473 F.3d at 865 (affirming 100 percent upward departure where "the extraordinary need to protect the public from Defendant's actions justify the sentence"); see also United States v. Lewis, 235 F.3d 394, 395-97 (8th Cir. 2000) (per curiam) (affirming a sentence which involved a 14-level upward departure and was "four times the maximum terms of imprisonment authorized in the absence of departure" in light of the extraordinary facts).

Although a 208-month, or 110 percent, upward variance is exceptional, the district court provided a thorough and well-reasoned explanation for imposing such a variance centered largely on the brutal nature of the offense and the threat that Gillmore posed to herself and the public as a result of her significant history of mental illness and chemical dependency.[3] This case presents an "extraordinary record," consisting in part of the 77 blows and wounds sustained by the victim, that distinguishes it from other second degree murder cases. Cf. Kendall, 446 F.3d at 785 (finding that the requisite extraordinary circumstances to support the 155 percent upward departure were not present because "there [was] nothing which set[] Kendall's case apart from any other methamphetamine case"). Therefore, this case's extraordinary circumstances justify the district court's extraordinary upward variance. Moreover, there is ample evidence in the record to support the imposition of a variance on these grounds. Additionally, our "concern that district courts elucidate their reasoning when sentencing defendants in order to assist reviewing courts and to avoid needless appeals," see Myers, 439 F.3d 418-19, is not implicated here because the district court thoroughly articulated its reasoning for issuing a non-Guidelines sentence.

---

[3]Gillmore seeks to focus our review of the reasonableness of the district court's sentence to two Guidelines departure provisions, section 5K2.8 ("Extreme Conduct") and section 5K2.14 ("Public Welfare"). However, the district court accepted the PSR's Guidelines range calculation and, at sentencing, did not depart upward pursuant to either section in imposing Gillmore's sentence. Rather, the district court varied upward pursuant to the section 3553(a) factors. Though the Statement of Reasons does not correspond to the sentencing transcript, the district court's oral pronoucement at sentencing controls. See United States v. Tramp, 30 F.3d 1035, 1037 (8th Cir. 1994) ("The oral pronouncement by the sentencing court is the judgment of court."); United States v. Glass, 720 F.2d 21, 22 n.2 (8th Cir. 1983) ("Where an oral sentence and the written judgment conflict, the oral sentence controls."); see also 18 U.S.C. § 3553(c) ("The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence . . . ."). Further, the district court did not cite section 5K2.14 in the Statement of Reasons. Thus, we decline to address Gillmore's arguments with regard to either section.

Furthermore, we have previously affirmed extraordinary upward departures and variances in other second degree murder cases. See United States v. Larrabee, 436 F.3d 890, 892-94 (8th Cir. 2006) (affirming 54 percent upward variance because of the brutality of the killing, the failure to call for help, and the defendant's significant criminal history); United States v. Loud Hawk, 245 F.3d 667, 670 (8th Cir. 2001) (affirming a ten-level upward departure where the defendant burned the victims' bodies and exposed a young witness to the crimes); United States v. Grey Cloud, 90 F.3d 322, 322-23 (8th Cir. 1996) (per curiam) (affirming upward departure to life sentence from Guidelines range of 188 to 235 months because the defendant had a prior murder conviction and the defendant dismembered the victim's body). Therefore, the extreme circumstances involved in this case indicate that "[t]he district court did not step outside the 'range of reasonableness.'" See D'Andrea, 473 F.3d at 865 (affirming sentence that represented 100 percent upward departure where "the extraordinary need to protect the public from Defendant's actions justify the sentence").

In addition, the 2004 amendments to the Guidelines, cited by the district court, weigh in favor of finding reasonable the extraordinary upward variance in this case. These amendments are "persuasive" in evaluating the reasonableness of Gillmore's sentence. See Larrabee, 436 F.3d at 893; see also Meyer, 452 F.3d at 1001-02 ("While our court cannot retrospectively apply enhancing amendments to the [G]uidelines in order to calculate the defendant's [G]uidelines range, such amendments are instructive as to whether a sentence outside of the [G]uidelines falls within the range of reasonableness."). Had the 2004 version of the Guidelines been used instead of the 2001 Guidelines, Gillmore would have had a base offense level of 38, as opposed to 33, and, as a result, faced a Guidelines range of 262 to 327 months. See United States Sentencing Commission, Guidelines Manual, § 2A1.2 (Nov. 2004). Accordingly, Gillmore's 396-month sentence would have required an upward variance of 69 months, or 21 percent, which would not have necessitated extraordinary

justification. Thus, the amendments indicate that the district court was within its discretion to impose the 396-month sentence. See Meyer, 452 F.3d at 1001-02 (affirming a fifty percent upward variance because recent amendments to the Guidelines would have put the sentence substantially below the mandatory sentence under the amended Guidelines); Larrabee, 436 F.3d at 893-94 (affirming a fifty-four percent upward variance in part because the sentence would be in the amended Guidelines range).

However, Gillmore contends that her sentence was unreasonable because: (1) it is based on impermissibly vague notions rejected by the Supreme Court's death penalty jurisprudence; (2) it violates Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), by assessing Gillmore's future dangerousness without the requisite scientific research; (3) Stately was likely dead before he sustained most of the injuries she inflicted; (4) her crime was the result of trauma and frenzy rather than intentional and deliberate acts; (5) it is contrary to social science research; and (6) it is clear error under United States v. McDonald, 461 F.3d 948 (8th Cir. 2006), because the district court predicted Gillmore would be dangerous if released from a shorter sentence.[4]

We find Gillmore's arguments based on the Supreme Court's death penalty jurisprudence and Kumho Tire Co. are inapplicable to our reasonableness review of her sentence. We further hold that, for sentencing purposes, the district court was within its discretion in declining to address which injury inflicted by Gillmore actually caused Stately's death because the cause of death was "assault with multiple injuries."

---

[4]Though Gillmore argued that the Supreme Court's anticipated decision in Claiborne v. United States would render the district court's reliance on the Guidelines improper, this argument fails in light of the Court's dismissal of Claiborne, see 551 U.S. ____, 127 S. Ct. 2245 (2007), vacating as moot, 439 F.3d 479 (8th Cir. 2006), and incorrect in light of the Court's recent affirmation of "[a] nonbinding appellate presumption that a Guidelines sentence is reasonable . . . ." See Rita v. United States, 551 U.S. ___, 127 S. Ct. 2456, 2466 (2007).

We also reject Gillmore's contention that her sentence is unreasonable because Stately's death was the result of trauma and frenzy rather than intentional and deliberate conduct on her part. This "argument is more relevant to the guilt phase and less relevant to the penalty phase of the proceedings," see United States v. Nelson, 347 F.3d 701, 709 (8th Cir. 2003), and was reviewed and rejected by the district court at that time. Moreover, even if Gillmore's claim could be construed as challenging as clearly erroneous the district court's fact-finding related to the calculation of her sentence, see Myers, 481 F.3d at 1112, ample evidence in the record supports the court's conclusion. With regard to Gillmore's assertion that her sentence is unreasonable in light of social science research addressing recidivism rates for the mentally ill, we find that the district court was within its discretion in determining Gillmore was a danger to herself and the public in light of her history of chemical dependency, mental illness, and the nature of the murder.

In addition, Gillmore's contention with regard to McDonald is not persuasive. See 461 F.3d 948. Gillmore asserts that McDonald establishes that the district court clearly erred by varying upward based on Gillmore's future dangerousness. The McDonald Court rejected a 50 percent downward variance; however, in doing so, it stated that "[t]he district court's determination that McDonald was unlikely to recidivate following his abbreviated sentence—a determination that relied upon McDonald's age and the [United States Supreme Court] Recidivism Study—[was] . . . insufficient to warrant a variance of the magnitude awarded." Id. at 953.

The present case is distinguishable from McDonald because Gillmore's sentence was not based on her age or a recidivism study but the district court's own evaluation of the threat Gillmore presents to the public based on her personal characteristics and the brutal nature of her crime. This was not error. Section 3553(a) explicitly allows a sentencing court to consider "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need . . . to protect the public from further crimes of the defendant." See 18 U.S.C. § 3553(a)(1),

(a)(2)(C). Thus, on this record, the district court did not abuse its discretion in concluding that a sentence above the Guidelines range was warranted, in part, by the threat to public safety evinced by Gillmore due to her personal characteristics. See United States v. Thomas, 454 F.3d 904, 905 (8th Cir. 2006) (finding no error in district court's weighing of a psychologist's report and the defendant's mental health in the context of section 3553(a)); United States v. Hines, 26 F.3d 1469, 1476-78 (9th Cir. 1994) (referencing defendant's mental health history in assessing his future dangerousness).

In sum, the district court properly identified circumstances that justify the extraordinary upward variance and did not abuse its discretion. Thus, we find, on the facts of this case, the resulting sentence is reasonable.

IV.

For the reasons stated above, we affirm the district court's imposition of a 396-month sentence, representing a 208-month upward variance, in this case.